# EXHIBIT "A"

IN THE SEVENTH JUDICIAL CIRCUIT, IN AND
FOR ST. JOHNS COUNTY, FLORIDA

COQUINA CROSSING
HOMEOWNERS ASSOCIATION,
INC., in its representative capacity
on behalf of itself, and all current and
former mobile homeowners in the Park,

    PLAINTIFF,                  CASE NO.   CA20 - 1041

Vs.

MHC OPERATING LIMITED
PARTNERSHIP, EQUITY
LIFESTYLE PROPERTIES, INC.,
MHC COQUINA CROSSING,
L.L.C., ERIC ZIMMERMAN,
GENA MAY, JARED LAMBERT,
WILLIAM SMOLJANOVICH,
MARTA LINDSTROM, FLORIDA
MANUFACTURED HOUSING
ASSOCIATION, INC., JOSEPH
ALLEN BOBO, AND LUTZ,
BOBO & TELFAIR, P.A.,
D/B/A LUTZ, BOBO, TELFAIR,
EASTMAN & BOBO, F/K/A
LUTZ, WEBB & BOBO, P.A.,

    DEFENDANTS.

_____/

## COMPLAINT AND DEMAND
## FOR JURY TRIAL

1

EXHIBIT "A"

## TABLE OF CONTENTS  Page

I. **INTRODUCTION** 3

 A. Representative Action by the Coquina Crossing HOA 4

 B. The Nature of the Product or Service: "55 or Older" Mobile Home Park 5

 C. Sam Zell, Chairman of Equity Lifestyle, Likes the "Oligopoly" Nature of the Mobile Home Park Industry 5

 D. Geographic Area or the Market: St. Johns County, Florida 6

II. **DEFENDANTS** 6

 A. The MHC/Equity LifeStyle Defendants 6

 B. The FMHA Trade Association Defendant 9

 C. The Lutz Bobo Law Firm Defendants 9

III. **JURISDICTION AND VENUE** 9

IV. **ACTS IN FURTHERANCE OF THE CONSPIRACY** 10

 A. Extort Adoption of an Illegal Rental Agreement 10

 B. Fraudulent and Unreasonable Lot Rental Categories & Amount 16

 C Defendants Impose Illegal Fees and Charges 17

 D. Unreasonable Elimination or Reduction of Services 17

V. **COUNT 1: FLORIDA ANTITRUST ACT** 20

VI. **COUNT 2: VIOLATION OF THE ADA** 25

VII. **JURY TRIAL DEMANDED** 31

EXHIBIT "A"

The Coquina Crossing Homeowners Association, Inc., in its representative capacity on behalf of itself, and over 900 current and former mobile homeowners in the Coquina Crossing Mobile Home Park ("Park"), by and through the undersigned counsel, bring this Complaint against these Defendants, divided into three descriptive relationships:

- The **MHC/Equity LifeStyle Defendants**: Defendants MHC Operating Limited Partnership, a foreign (Illinois) limited partnership, Equity LifeStyle Properties, Inc., a foreign (Maryland) corporation, MHC Coquina Crossing, L.L.C., a Delaware limited liability company, Eric Zimmerman, an individual, Gena May, an individual, Jared Lambert, an individual, William Smoljanovich, an individual, and Marta Lindstrom, an individual;

- The **FMHA Trade Association Defendant**: Florida Manufactured Housing Association, Inc., a Florida corporation;

- The **Lutz Bobo Law Firm Defendants**: J. Allen Bobo, an individual, and Lutz, Bobo & Telfair, P.A., a Florida corporation.

The individuals and entity defendants described above are collectively referred to in this Complaint as "Defendants." The Plaintiff further alleges:

## I.    INTRODUCTION

1.    Beginning at a time uncertain, but as least as early as 2011, and continuing on through the present time, the Defendants have entered into and engaged in a conspiracy, combination, or concert of action in unreasonable restraint of trade and commerce within the State of Florida and elsewhere with effects in the State of Florida in violation of § 542.18, *Fla. Stat.*, by agreeing to the following:

EXHIBIT "A"

      A.      Extort adoption of an illegal rental agreement;

      B.      Imposed fraudulent and unreasonable lot rental categories and amount;

      C.      Defendants Impose Illegal Fees and Charges; and

      D.      Unreasonably eliminated or reduced services.

Engaging in the business of owning and operating mobile home parks within the State of Florida constitutes trade or commerce within the meaning of Chapter 542, *Fla. Stat.*

2.      As a result of the unlawful conduct, the elderly mobile home owners represented by the Coquina Crossing Homeowners Association, Inc., suffered an antitrust injury resulting in damages in excess of $30,000.00. This conspiracy, combination, or concert of action resulted in higher mobile home lot rental prices paid by elderly natural persons for the use of mobile home park facilities than would have existed in a competitive market.

3.      Defendants' unlawful conduct is continuing and unless equitable relief is granted artificially inflated mobile home lot rental prices for the use of mobile home park facilities will continue unabated.

**A.     Representative Action by the Coquina Crossing HOA**

4.      Plaintiff Coquina Crossing Homeowners Association, Inc., ("Coquina Crossing HOA"), is a Florida not-for-profit corporation with its principal place of business located at P.O. Box 42, St. Johns County, Elkton, Florida. The Coquina Crossing HOA is an incorporated mobile home owner association and the legal representative under § 723.075 (1), *Fla. Stat.*, of all of the mobile home owners in the Park "in all matters relating to the Florida Mobile Home Act." *See*] §§ 723.075(1) and 723.076(1) and "matters of common interest ." *Rule* 1.222, *Fla. R. Civil P.* The Plaintiff represents itself, and over 900 current and former mobile homeowners in the Park. The relationship between the

EXHIBIT "A"

Coquina Crossing HOA, the homeowners represented by the Coquina Crossing HOA and the Park owner or operators is regulated under Chapter 723, *Fla. Stat.*, and encompasses a broadly defined "lot rental agreement" which includes, *inter alia*, a prospectus. Exh. A is attached and adopted.

### B.    The Nature of the Product or Service: "55 or Older" Mobile Home Park

5.    The Park is an age 55 or older mobile home park with 742 mobile home rental residential lots. The Park is located at 4536 Coquina Crossing Dr., St. Johns County, City of Elkton, Florida. The Plaintiff mobile homeowners are largely elderly persons over 65 years of age. The mobile homes are valued between $25,000 and more than $100,000. Most homes are paid for with cash, usually comprising all or a substantial amount of the homeowners' life savings. They lease the lot underneath their mobile home from the Park owner or operators.

### C.    Sam Zell, Chairman of Equity Lifestyle, Likes the "Oligopoly" Nature of the Mobile Home Park Industry

6.    Approximately 1.8 million Floridians today live in a mobile home. In a 2014 Tampa Bay Times newspaper article, it was noted that the population of Florida mobile homeowners represents five times the entire population of the city of Tampa, Florida. Most of those homeowners earn less than $30,000 per year. Largely, those mobile homeowners are a captive audience: "... As Frank Rolfe, a park owner who runs [the[ Mobile Home University, a boot camp for investors, told *Bloomberg*, 'We're like a Waffle House where everyone is chained to the booths." *Mobile home park investors bet on older, poorer America*, Tampa Bay Times, May 19, 2014.[1] "Years ago, the mobile home industry was mostly ignored save for a few investment titans. Warren Buffet paid $1.7 billion in 2003 to buy Clayton Homes, one of America's largest mobile home conglomerates. Sam

---

[1]    https://www.tampabay.com/news/business/realestate/mobile-home-park-investors-bet-on-older-poorer-america/2180277/

EXHIBIT "A"

Zell, the billionaire chairman of Equity Lifestyle, said in a 2012 conference call he liked the 'oligopoly nature of our business.'" [referring to the mobile home park industry] *Id.* The MHC/Equity LifeStyle Defendants directly or indirectly own, control, or operate 77 age-qualified Florida mobile home parks with approximately 32,000 mobile home sites with gross revenues in excess of $230 million annually.

### D.    Geographic Area or the Market: St. Johns County, Florida

7.    St. Johns County has a population of approximately 275,000 persons. Sixteen per cent of the population is 65 years of age or older. There are twelve mobile home parks in St. Johns County, Florida. Five of those parks are "55 or older" mobile home parks which would market to a group of elderly retirees, such as those represented by the Coquina Crossing HOA. The monthly lot rental amount varies by only a minor amount between the Park and the "comparables" used by the Defendants in rejecting the representative Coquina Crossing HOA's attempts to negotiate mitigation of the existing regular annual lot rental increases of four to five per cent.

## II.    DEFENDANTS

### A.    The MHC/Equity LifeStyle Defendants

8.    Defendant **MHC Operating Limited Partnership ("MHC Operating")**, is a foreign (Illinois) limited partnership, formed in 1993 with a principal address of Two North Riverside Plaza, Suite 800, Chicago, Illinois, which is also the Chicago corporate headquarters for Defendants Equity LifeStyle Properties, Inc. and MHC Coquina Crossing, L.L.C. MHC Operating is also engaged in business at the Park. MHC Operating is a general partner of Equity LifeStyle Properties, Inc., since April 2004. MHC Operating is described in official court records in the St. Johns County Clerk of Court as the "mobile home park owner" of the Park as defined by § 723.003(13), *Fla. Stat.,* which includes an "owner" or "operator." MHC Operating is also an operator of the Park.

EXHIBIT "A"

9.      Defendant **Equity LifeStyle Properties, Inc., ("Equity LifeStyle")** is a foreign (Maryland) corporation with its principal place of business in Florida at: 4300 W. Cypress St., Suite 400, Tampa, in Hillsborough County; and in Illinois at: Two North Riverside Plaza, Suite 800, Chicago, Illinois. Equity LifeStyle is the "mobile home park owner" of the Park as defined by § 723.003(13), *Fla. Stat.*, which includes an "owner" or "operator." Equity LifeStyle is also an operator of the Park. Equity LifeStyle is publicly traded on the New York Stock Exchange. Equity LifeStyles is a subsidiary of MHC Operating Limited Partnership.

10.      Defendant **MHC Coquina Crossing, L.L.C. ("MHC Coquina Crossing")** is a Delaware limited liability company with its principal place of business located at Two North Riverside Plaza, Suite 800, Chicago, IL 60606, which is also the Chicago corporate headquarters for Defendants Equity LifeStyle Properties, Inc., and MHC Operating Limited Partnership. MHC Coquina Crossing is also engaged in business at the Park. MHC Coquina Crossing is described in official court records in the St. Johns County Clerk of Court as the "mobile home park owner" of the Park as defined by § 723.003(13), *Fla. Stat.*, which includes an "owner" or "operator." MHC Coquina Crossing is also an "operator" of the Park as defined by § 723.003(16), *Fla. Stat.* Its Managing Member is MHC Operating Limited Partnership, the same holding company for Defendant Equity LifeStyle Properties, Inc.

11.      Defendant **Eric Zimmerman** is an individual citizen of Florida domiciled at 12629 New Brittany Blvd., #16, Fort Myers, in Lee County, Florida. Eric Zimmerman was a Regional Vice President of Defendant Equity LifeStyle Properties, Inc., from 2011 through July 2018. He is currently Vice President and Chief Operating Officer at Murex Properties, LLC. Eric Zimmerman was also engaged in business from 2011 through July 2018 as an operator of the Park as defined by § 723.003(16), *Fla. Stat.* He has held leadership positions of the Defendant Florida Manufactured Housing Association, Inc. –

7

the trade association for park owners.

12.     Defendant **Gena May** is an individual citizen of Florida domiciled at Lake County at 13510 Palo Ct., Clermont, Florida. Gena May was a Regional Manager of Defendant Equity LifeStyle from July 2009 through May 2016. Gena May was also engaged in business from July 2009 through May 2016 as an operator of the Park as defined by § 723.003(16), *Fla. Stat*. Gena May is currently employed as a Regional Vice President of Operations & Sales with Sun Communities since May 2016.

13.     Defendant **Jared Lamber**t is an individual citizen of Florida domiciled at Polk County 4634 Devonwood Ct., Lakeland, Florida. Jared Lambert was a Senior Regional Manager of Defendant Equity LifeStyle from October 2011 through July 2017. Jared Lambert is currently employed as a Regional Vice President with Murex Properties, LLC, since April 2020. Jared Lambert was also engaged in business from 2011 through 2017 as an operator of the Park as defined by § 723.003(16), *Fla. Stat*.

14.     Defendant **William Smoljanovich** is an individual citizen of Florida domiciled on Pasco County at 31351 Bridgegate Dr., Wesley Chapel, Florida. William Smoljanovich is a Regional Manager of Defendant Equity LifeStyle from 2018 through present. William Smoljanovich was also engaged in business from 2018 through present as an operator of the Park as defined by § 723.003(16), *Fla. Stat*. William Smoljanovich was previously a Regional Vice President of Sales and Operations at Sun Communities.

15.     Defendant **Marta Lindstrom** is an individual citizen of Florida domiciled at Volusia County at 11 Brookside Cir., Ormond Beach, Florida. Marta Lindstrom was the Park manager and operator from 2018 to 2020. Marta Lindstrom was recently hired by Murex Properties, L.L.C., to be the Park manager at Aberdeen Mobile Home Park in Ormond Beach, Florida.

16.     MHC Operating, Equity LifeStyle, MHC Coquina Crossing, Eric Zimmerman, Gena May, Jared Lambert, William Smoljanovich, and Marta Lindstrom are

EXHIBIT "A"

collectively referred to herein as the "MHC/Equity LifeStyle Defendants."

>    **B.    The FMHA Trade Association Defendant**

17.    Defendant **Florida Manufactured Housing Association, Inc., ("FMHA Trade Association Defendant")** is a Florida corporation with its principal place of business at 1284 Timberlane Rd., Tallahassee, Florida. The FMHA Trade Association Defendant is a trade association for all Florida mobile home park owners.

>    **C.    The Lutz Bobo Law Firm Defendants**

18.    Defendant **J. Allen Bobo ("Allen Bobo")** is an individual citizen of Florida domiciled in Sarasota County, Florida at an unknown physical address. Allen Bobo is a licensed Florida lawyer since 1982, a partner, principal, or shareholder of Defendant Lutz, Bobo & Telfair, P.A., 2 N. Tamiami Trail, Ste. 500, Sarasota County, Sarasota, Florida.

19.    Defendant **Lutz, Bobo & Telfair, P.A. ("Lutz Bobo Law Firm")**, d/b/a Lutz, Bobo, Telfair, Eastman, Gabel & Lee, f/k/a Lutz, Webb & Bobo, P.A., is a Florida corporation which operates in Leon County, Florida at 2155 Delta Blvd., Suite 201B, Tallahassee, Florida and in Sarasota County, Florida at One Sarasota Tower, Two North Tamiami Trail, Fifth Floor, Sarasota, Florida.

20.    Allen Bobo and the Lutz Bobo Law Firm are collectively referred to herein as the "Lutz Bobo Law Firm" Defendants.

## III.    JURISDICTION AND VENUE

21.    Count One of this Complaint is an action for treble damages arising under § 542.18, *Fla. Stat.*, in accordance with § 542.22, *Fla. Stat.*, and for injunctive relief in accordance with § 542.23, *Fla. Stat*. This Court has jurisdiction of this claim arising under the Florida Antitrust Act, Chapter 542, *Fla. Stat.* Plaintiff also seeks relief in Count Two under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.* Jurisdiction of the federal ADA claim is concurrent under 18 U.S.C. § 3231, as construed

EXHIBIT "A"

by *Tafflin et al., v. Levitt, et al.*, 493 U.S. 455 (1990). This Court also has personal jurisdiction over each Defendant under § 48.193, *Fla. Stat.*, because, among other reasons, each Defendant operates, conducts, engages in, or carries on a business or business venture in the State of Florida or has an office in the State of Florida or has committed tortious acts within the State of Florida.

22.    Venue is proper under §§ 47.011, 47.021, and § 542.30, *Fla. Stat.*

23.    Plaintiff seeks damages in excess of $30,000.00, injunctive relief, attorneys' fees, and costs on behalf of itself and the represented mobile homeowners.

## IV.    ACTS IN FURTHERANCE OF THE CONSPIRACY

### A.    Extort Adoption of an Illegal Rental Agreement

24.    The MHC/Equity LifeStyle Defendants have, over the past five years repeatedly, and outside of either statutory meetings or confidential mediation efforts, extorted the representative Coquina Crossing HOA and Plaintiff mobile homeowners to adopt an illegal standardized lot rental agreement ("LTA") authored and drafted by the Lutz Bobo Law Firm Defendants. The FMHA Trade Association Defendant encouraged distribution and discussion of the terms of the LTA among its assembly of mobile home park owners. A copy of the form or standardized LTA is attached as Exhibit B and adopted.

25.    Section 3 of the standardized LTA required that if the Coquina Crossing HOA contended that MHC Coquina Crossing was in violation of the LTA, the prospectus, any rental agreement, or the Florida Mobile Home Act, the Coquina Crossing HOA must notify MHC Coquina Crossing in writing of the facts "giving rise to and constituting such alleged Non-Compliance" by certified mail within thirty days of the date the Coquina Crossing HOA received reasonable notice of such facts. The LTA then provided MHC Coquina Crossing fifteen days from receipt of the notice to "cure" the

EXHIBIT "A"

alleged non-compliance. Upon completion of any such cure, MHC Coquina Crossing was to be "deemed" not to have been in default or in violation.

26.     Section 3 of the LTA required that the thirty day notice and fifteen day opportunity to cure provisions be deemed to be a condition precedent to any legal action.

27.     Section 4 of the LTA prohibited an award of attorneys' fees or costs in any proceeding "by or on behalf of any former or current Homeowner seeking to invalidate or otherwise dispute the validity of the [LTA]." Further, section 4 of the LTA required the Coquina Crossing HOA and MHC Coquina Crossing to "mutually enforce this Agreement and cooperate fully in the event the validity or integrity of this Agreement is attacked or disputed by any such Homeowner."

28.     Section 5 of the LTA required that any controversy or claim related to the LTA shall first require non-binding mediation under Chapter 44, , *Fla. Stat*. Section 5 also required that in any court proceeding "arising out of or relating to" the LTA, the parties must waive their right to a jury trial.

29.     Section 6 "Association Release" of the LTA expressly releases the Defendants (along with a broad litany of unknown and unidentified persons and entities) and:

> ... their parents, affiliates, subsidiaries, officers, directors, agents, stockholders, members, attorneys, successors and assigns from any and all claims, actions or causes of action of any kind whatsoever ?? ("Claims"), whether legal, equitable, administrative, or otherwise, which the Association now has or ever had including, but not limited to, Claims involving or relating to rents, services, maintenance, or Owner's compliance with or delivery of the Community's prospectuses, rental agreements, as well as any other alleged violation of Chapter 723, Florida Statutes. The Claims shall specifically include all claims, actions, causes of action, or reduction in service arising or in any related to the lack of an indoor pool from approximately August 2011.

11

30.    Section 6 (or an unmarked Section 7) of the LTA elevated the LTA as controlling in the event of a conflict between the LTA and the prospectus or rental agreement.

31.    Section 8 of the LTA declared that the LTA superseded all prior and contemporaneous discussions, negotiations, conditions or understandings relating to the LTA.

32.    Section 9 of the LTA required that the Coquina Crossing HOA "confirm the validity" of the LTA and execute documents and take action as requested by the Defendants to "carry out or more effectively satisfy the intent and purposes" of the LTA.

33.    The above provisions of the LTA are in clear violation of Chapter 723, The Florida Mobile Act, the Florida Constitution, and the U.S. Constitution and are injurious to the Plaintiff.

34.    The MHC/Equity LifeStyle Defendants' close relationships with the FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants enable them to collaborate with other mobile home park owners and ultimately with each other to develop and expand state-wide adoption of the LTA by other mobile home park owners. In 2016 Attorney Allen Bobo, partner in the Lutz Bobo Law Firm, described that he worked closely with Eric Zimmerman, then Senior Vice President of Equity LifeStyle, on revisions and implementation of LTAs identical to the LTA in the instant cause. In one instance, recited Allen Bobo, a homeowner (in another Equity LifeStyle Park) pointed to an ambiguity in the LTA favorable to their homeowner association. In response, Eric Zimmerman then quipped to Allen Bobo: "How did you miss that one, Allen?"

35.    In the March 28, 2013 meeting notes of the Equity LifeStyle supported Networking for Progress Group, the notes taken of the meeting between representatives of various Florida Equity LifeStyle Parks and Eric Zimmerman discussed the LTA:

EXHIBIT "A"

**\*\*\*\***

ELS standardized the Long Term Agreement 3-4 years ago but has made some minor tweaks to it as needed. The only thing that will change from community to community will be the amount of the increase and the term. There will be no wish lists included in future LTAs, strictly rent. Wish lists (to be included in the Capx budget), are to be discussed with the manager and regional manager at the quarterly meetings (which must be requested).

**\*\*\*\***

(Exh. C is attached and adopted)

36.    In the September 12, 2013 meeting notes of the Select Committee of the Equity LifeStyle supported Networking for Progress Group, the notes taken of the meeting between representatives of various Florida Equity LifeStyle Parks and Eric Zimmerman discussed the LTA:

**\*\*\*\***

Long Term Agreements: were discussed, first with the ELS definition being a rental agreement that may change the terms of the prospectus. This was not an in depth discussion of rental agreements but was brought up because several communities are reporting that ELS has refused to meet and discuss long term agreements. We were reminded by Eric [Zimmerman] that they are actually required to meet just once and that should be within the thirty days (as requested) after receiving the 90 day notice per FS, Chapter 723.037. Eric [Zimmerman] pointed out that the negotiating committee has the full authority to sign the long term agreement.

**\*\*\*\***

(See Exh. C)

37.    In the November 21, 2013 meeting notes of the Select Committee of the Equity LifeStyle supported Networking for Progress Group, the notes taken of the meeting between representatives of various Florida Equity LifeStyle Parks and Eric Zimmerman discussed the LTA:

**\*\*\*\***

13

EXHIBIT "A"

Future LTAs will be reviewed by in house counsel. It was pointed out that the language in the LTA, particularly that referring to the waiver, is one of the reasons that communities are not signing the agreement. Eric [Zimmerman] pointed out that that paragraph refers only to situations that have occurred to that point (NOT FUTURE SITUATIONS). If there are issues serious enough that you are considering legal action against ELS they should be discussed (prior to signing the agreement) in an effort to work them out. The purpose of the waiver is after working out a favorable agreement in good faith, they (ELS) don't want to be faced with a lawsuit.

Remember, if you previously signed the long term agreement (LTA) (containing the clauses referenced above), when the LTA expires, so do the terms of those clauses, UNLESS the LTA contained language stating otherwise. Communities with CPI (only) based increases typically don't have long term agreements. Eric [Zimmerman] explained that the release for ELS in the LTA speaks to the many reasons somebody may choose to sue them. The reason the HOA isn't offered the same release is because there don't appear to be any reasons why ELS would want to sue them.

Long Term Agreements may vary, but are typically three years. Rounding of rent increases are determined by the prospectus for the community, some allow rounding up to one (1) dollar, some allow up to five (5) dollars.

There are no penalties for not signing the long term agreement.

Market, CPI, home sales and a variety of economic factors are taken into consideration to determine rates of increase, not the expected return to stockholders, as suggested.

<div align="center">****</div>

(See Exh. C)

38.    In the February 19, 2015 meeting notes of the Select Committee of the Equity LifeStyle supported Networking for Progress Group, the notes taken of the meeting between representatives of various Florida Equity LifeStyle Parks and Eric Zimmerman discussed the LTA:

<div align="center">****</div>

<div align="center">14</div>

<div align="right">EXHIBIT "A"</div>

... Relocating resident policy: ELS's policy regarding relocating residents is the same as addressed in the LTA under Homeowners Affected by this Agreement; Transferees. If ..... any included Homeowner transfers or sells any legal or equitable interest in such Homeowner's mobile home to any transferee or resale purchaser (collectively, a "Transferee"), the Transferee shall be permitted to assume such included Homeowners rental agreement but only for the remainder of the annual lease term then in effect between the included Homeowner and Owner. Upon the expiration of such annual lease term the Transferee's rent shall be adjusted to the Community's then prevailing market rate ..... " Which is basically the same as FS Chapter 723.059 (3) The purchaser of a mobile home who becomes a resident of the mobile home park in accordance with this section has the right to assume the remainder of the term of any rental agreement then in effect between the mobile home park owner and the seller ........... .

It should be noted that residents relocating within the community that are purchasers of ELS inventory homes won't have a lease to assume and will start their new lease at market rent but are eligible for any rent concession programs being offered to new residents at that time.

****

(Exh. D is attached and adopted)

39.    In 2016, Florida Attorney Shawn Arbeiter disclosed that Attorney Allen Bobo (then a partner and shareholder of the Lutz Bobo Law Firm) had made numerous and regular annual presentations to the FMHA Trade Association Defendant's annual meeting of Florida mobile home park owners informing the FMHA Trade Association Defendant's assembly of litigation tactics of mobile home plaintiffs' attorneys. According to Arbeiter, those lengthy presentations by Bobo included opinionated and disparaging remarks by Bobo and assembly members of the undersigned Plaintiff's Counsel Perry's trial strategy including, but not limited to: application of the Florida Deceptive and Unfair Trade Practices Act to lot rental, common area maintenance, and LTA issues in state court litigation. Attorney Bobo also disclosed that in an earlier and separate presentation to the FMHA Trade Association Defendant assembly, he described existing statewide mobile

15

home lot rental amounts as "not high enough," explaining that if lot rent increases were appropriately higher, that retiree mobile homeowners would be filing lawsuits all over the state.

40.     Since 2016, the Equity LifeStyle Defendants have imposed a flat four per cent annual lot rental increase. The Equity LifeStyle Defendants refused to discuss with the representative Homeowners' Committee of the Coquina Crossing HOA the basis or justification for the flat four per cent increase. The Equity LifeStyle Defendants flatly rejected the Coquina Crossing HOA's Homeowners' Committee's submission of other park comparables and other matters in mitigation in violation of Florida law.

41.     On repeated occasions since 2016, the Equity LifeStyle Defendants extorted the elderly Plaintiff and their representative Coquina Crossing HOA in violation of Florida law by offering to consider a lesser lot rental increase if the Plaintiff and their representative Coquina Crossing HOA would agree to execute an illegal standardized LTA on behalf of all of the plaintiff homeowners in the Park.

**B.    Fraudulent and Unreasonable Lot Rental Categories and Amount**

42.     The Equity LifeStyle Defendants' lot rental categorization of "on water" is false and fraudulent. The Park "on water" categorization are simply retention ponds. During substantial periods of the year those retention ponds are eyesores and a drag on access, use, and enjoyment of the property or Park.

43.     Lots categorized as facing a "wooded" are also false and fraudulent. The land falsely attributed to "wooded" is simply conservation area with accumulated overgrowth, rubbish and debris. According to the local Fire Marshall, the close proximity of a home to the "wooded" conservation area creates a significant fire risk to those homes.

44.     Lots facing or in proximity to a "wooded" currently pay a premium of approximately $40 per month or $480 per year. "Water" lots pay a premium of

EXHIBIT "A"

approximately $120 per month or $1,440 per year.

45.    There are 742 approved lots in the Park which include 36 rentals.
Approximately 260 homeowners pay an average of $912 per year or a total of $237,120
for falsely being on "water" or in the proximity of a "wooded" area. Considering that the
average residency for a mobile homeowner is ten years, the damages from the false and
fraudulent lot rental premium categorization exceeds 2.3 million dollars.

**C.    Defendants Impose Illegal Fees and Charges**

46.    The following fees and charges "authorized" by the Prospectus[2] were
implemented or are enforced in an illegal, discriminatory, retaliatory, or unreasonable
manner by the Equity LifeStyle Defendants in violation of Florida and federal law or are
otherwise unconscionable and oppressive:

- New Resident Processing Charge ($300);
- Additional Occupant/Guest Fee ($15 per person per month);
- Delinquent Lot Rental Fee (10% late fee due if not paid on or before the fifth day of the month);
- Special Service Fee ($15 per hour - minimum one hour);
- Water or Sewer Line Repair Fee.

**D.    Defendants Unreasonably Eliminate or Reduce Services**

47.    The Equity LifeStyle Defendants unreasonably eliminated or reduced
services without an advance 90 day written notice or a corresponding reduction in lot rent
in violation of Florida law, including, but not limited to:

---

2        Exhibit A. The fees indicated were handwritten entries on the Prospectus.

17

EXHIBIT "A"

A.     The Equity LifeStyle Defendants are unresponsive and have reduced maintenance;

    1.     Full-time maintenance staff reduced. During the class period maintenance employees' hours were reduced by 70 hours per week of maintenance labor;

    2.     The Equity LifeStyle Defendants do not respond to the phone calls, emails, and other correspondence;

    3.     The Equity LifeStyle Defendants do not conduct 360-degree home inspections; does not enforce rules and regulations and are unavailable after normal business hours to enforce the rules and regulations;

B.     Pool, Hot-tub/spa

    1.     The Park swimming pools and hot tub bottoms are frequently discolored and unsightly, causing homeowners to question their cleanliness. The grouting around the edges of the outdoor pool and the hot tub require replacement or repair. The Hoyer lift in the indoor pool is inoperative;

    2.     The Equity LifeStyle Defendants purchased unsafe pool furniture resulting in falls by homeowners;

C.     Security

    1.     The Equity LifeStyle Defendants are unresponsive to homeowner or law enforcement reports of criminal behavior in the Park. The Equity LifeStyle Defendants have neglected to provide law enforcement standing permission to issue trespass orders to strangers who enter the Park;

    2.     The Park gate and the gate security camera system have

been inoperative for weeks and months at a time;

D.    Clubhouse

    1.    The Equity LifeStyle Defendants have no security or supervision of members of the general public who use the clubhouse facilities.

E.    Common Areas - Facilities, lighting, landscaping, etc.

    1.    There are inadequate Park-wide water shut-off valves. The shut-off valves for each home were buried and often defective;

    2.    Partial power outages in the Park are common occurrences. Several sections in the Park are on conjoined breakers which, in the event of a power loss, delay restoration of electricity for days while the rest of the Park enjoys restoration of electricity in a matter of hours.

F.    Common Areas - Streets

    1.    The streets throughout the Park and clubhouse parking lots are in disrepair, crumbling and dangerous to pedestrians and bicycle traffic. The Equity LifeStyle Defendants' periodic repaving of the clubhouse parking lot did not include a working drainage system to eliminate the conditions;

    2.    Streets throughout the Park are unsightly. Grass grows in some of the cracks in the pavement;

    3.    The Park water sprinklers are infrequently activated or when activated are not left on long enough to provide adequate water for the lawns. Typically, the water sprinklers are misdirected and not adjusted to provide even coverage.

19

The consequence of improper sprinkling is that the lawns in the Park are unsightly and damaged;

G.   "55 and Older" Park

1.   The Equity LifeStyle Defendants have failed to supervise or restrict children in the shared facilities in the Park as required by the properly promulgated Park rules and regulations. Unlicensed persons frequently drive golf carts without supervision.

## V.   COUNT I:   FLORIDA ANTITRUST ACT - RESTRAINT ON TRADE OR COMMERCE - PRICE-FIXING

### (Against All Defendants)

### *Fla. Stat.* § 542.18

48.   Plaintiff realleges and restates paragraphs 1 through 47 as if fully set forth herein and further state:

49.   This is an action against the MHC/Equity LifeStyle Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants for their violation of the Florida Antitrust Act, Section 542.18, *Fla. Stat.*

50.   Since at least October 2016, the MHC/Equity LifeStyle Defendants (or one or more of its subsidiaries) leased mobile home lots to the homeowners represented by the Plaintiff, in a continuous and uninterrupted flow of interstate trade or commerce, including through and into this judicial district within the meaning of the Florida Antitrust Act.

51.   The MHC/Equity LifeStyle Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants knowingly—that is, voluntarily and intentionally—extorted under Florida law and attempted to entered into a continuing agreement, understanding, and conspiracy to raise, fix, maintain, and/or to impose a

20

EXHIBIT "A"

mobile home lot rental by subjecting the Plaintiff mobile homeowners, their representative mobile homeowner associations ("HOAs"), and the Park lot rental agreements to, among other things, impose a LTA, thereby reducing or eliminating price competition.

52.    To be clear, Plaintiff is not alleging that the MHC/Equity LifeStyle Defendants, working with FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants, conspired to fix the prices of mobile home lot rental amount at the same level. Instead, the MHC/Equity LifeStyle Defendants, working with FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants, conspired to eliminate discounting of lot rental amount by ensuring that all park owners charged the same minimum price and used the same terms.[3] The MHC/Equity LifeStyle Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm all share an interest in not reducing the lot rental amount.

53.    The scheme was anything but "unilateral." The conduct at issue here can be characterized similarly to how the United States Supreme Court characterized the conduct at issue in *United States v. General Motors Corp.*: "once the agreements were secured, General Motors both solicited and employed the assistance of its alleged co-conspirators in helping to police them. What resulted was a fabric interwoven by many strands of joint action to eliminate the discounters from participation in the market, to inhibit the free choice of dealers to select their own methods of trade and to provide multilateral surveillance and enforcement. This process for achieving and enforcing the desired objective can by no stretch of the imagination be described as 'unilateral' or merely 'parallel.'" 384 U.S. 127, 148 (1966)

54.    The FMHA Trade Association Defendant, as the Florida mobile home park owners' trade association represented by the Lutz Bobo Law Firm Defendants,

---

3    As the United States Supreme Court stated in *Catalano, Inc. v. Target Sales*, 446 U.S. 643, 648 (1980), an "agreement to eliminate discounts" "falls squarely within the traditional *per se* rule against price fixing." (Emphasis added)

EXHIBIT "A"

worked with the MHC/Equity LifeStyle Defendants and the Lutz Bobo Law Firm Defendants to develop and implement LTAs and other matters alleged herein, *supra*, across Florida mobile home parks. That is, FMHA Trade Association Defendant, was in a position to communicate to Florida mobile home park owners before it implemented the scheme including, but not limited to, the LTA that its competitors also intended to do so and the suggested format of the LTA.

55.     The MHC/Equity LifeStyle Defendants and the Lutz Bobo Law Firm Defendants' close relationships with the FMHA Trade Association Defendant, enabled them to collaborate with other mobile home park owners and ultimately with each other to develop these conspiratorial plans, including the LTA. Since 2015 Allen Bobo, and the Lutz Bobo Law Firm worked closely with Eric Zimmerman, then Senior Vice President of Equity LifeStyle, on revisions and implementation of LTAs, for example.

56.     Each of the MHC/Equity LifeStyle Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants had a motive to maintain high retail prices for mobile home lot rental amounts. In addition, in order to encourage independent mobile home park owners to adopt and implement LTAs, the MHC/Equity LifeStyle Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants needed to keep the resale mobile home lot rental amounts high.

57.     The MHC/Equity LifeStyle Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants have also demonstrated a past propensity to conspire against other mobile home park owners discounting mobile home lot rental amounts.

58.     The MHC/Equity LifeStyle Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants' agreement to implement LTAs has harmed and continues to harm competition by increasing prices for the mobile home lot rental amounts made subject to them. Consumers ultimately pay the economic cost of this

wrongful conduct in the form of higher prices for mobile home lot rental amounts affected by LTAs. The effect of the LTAs has been to limit consumer choice by depriving them of the ability to shop around for discounts on mobile home lot rental amounts.

59.    The MHC/Equity LifeStyle Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants (and their co-conspirators) furthered and effectuated their conspiracy in the following ways, among others:

A.    Participating in secret communications, discussions, and meetings in the U.S. to exchange confidential and competitively sensitive information regarding each other's lot rental amounts charged in their Florida mobile home business;

B.    From time to time, discussing and agreeing during those conversations and meetings to set a price floor to be quoted to a mobile homeowner;

C.    Perpetuating the Florida mobile home industry-wide intentional frustration of the Plaintiff's and other representative homeowners' associations' statutory right of first refusal to purchase their Park;

D.    Perpetuating the distribution of an illegal LTA which supports their fixed rent increases and violates Chapter 723, *Fla. Stat.*, and the homeowners' right to a civil jury trial in violation of the Florida and United States Constitution;

E.    Imposed fraudulent and unreasonable lot rental categories and amount;

F.    Imposed illegal fees and charges; and

G.    Unreasonably eliminated or reduced services.

60.    As a direct and proximate result of the MHC/Equity LifeStyle Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants' conduct,

EXHIBIT "A"

the homeowners represented by the Plaintiff have been harmed and will continue to be harmed by paying supra-competitive lot rental amounts charged in Florida mobile home parks that they would not have paid in the absence of the conspiracy.

61.     The MHC/Equity LifeStyle Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants' combination, conspiracy, acts, and practices, or the effects thereof, are continuing and will continue and are likely to recur unless permanently restrained and enjoined.

**RELIEF REQUESTED**

Wherefore, Plaintiff respectfully requests the following relief:

1.     A jury verdict for compensatory damages;

2.     A judgment against all defendants, jointly and severally, by the Court for treble the amount of the jury verdict and for attorney's fees, costs and interest as allowable by law for violations of the Florida Antitrust Act;

3.     An order that each defendant be permanently enjoined from future violations of Chapter 542, *Fla. Stat.*

4.     An order that the plaintiff be awarded its costs of this suit and reasonable attorney's fees pursuant to § 542.22(1), *Fla. Stat.*;

5.     A judgment and decree that the defendants have engaged in an unlawful combination or a conspiracy restricting trade and commerce in violation of § 542.18, *Fla. Stat.*

6.     Award the Plaintiff such other and further equitable and legal relief as the Court deems just and necessary.

EXHIBIT "A"

## VI.    COUNT 2:    VIOLATION OF THE AMERICANS WITH DISABILITIES ACT ("ADA")

**(Against Defendants MHC Operating, Equity LifeStyle, MHC Coquina Crossing, Eric Zimmerman, Gena May, Jared Lambert, William Smoljanovich, and Marta Lindstrom)**

### 42 U.S.C. §§ 12101 *et seq*

62.    Plaintiff realleges and restates paragraphs 1 through 16 and 21 through 22 as if fully set forth herein and further state:

63.    The homeowners represented by the Plaintiff are elderly persons. They have mobility, balance, gait, vision, and hearing difficulties. When traveling about in public, many mobile homeowners require the use of either walking canes or sticks, walkers, wheelchairs, audiovisual devices, and hearing aids. Consequently, many mobile homeowners are physically disabled, as defined by all applicable Florida and United States laws, and a member of the public whose rights are protected by these laws.

64.    The homeowners represented by the Plaintiff suffer from low vision and age-related cognitive decline as a "qualified disability" under the ADA as defined in 42 U.S.C. §12012 (1)(A) and in 42 U.S.C. 3602, §802(h). They are substantially limited in performing one or more major life activities, including but not limited to accurately visualizing their world, adequately traversing obstacles and walking without assistance.

65.    Many of the elderly mobile homeowners are disabled and have mobility and accessibility challenges. The MHC/Equity LifeStyle Defendants refuse to make even common areas of public accommodation ADA compliant. In response to the Plaintiff's expressed concerns, the MHC/Equity LifeStyle Defendants asserted that the Americans with Disabilities Act is inapplicable to the Park Clubhouse and refuse to discuss it further.

66.    The MHC/Equity LifeStyle Defendants regularly meet with and encourage the general public to enter the clubhouse facilities to discuss Park business

EXHIBIT "A"

and permit outside guests and vendors to traverse the Park facilities. The clubhouse was also previously used as a public voting precinct. The MHC/Equity LifeStyle Defendants have no security or supervision of members of the general public who use the clubhouse facilities.

67.    The Park clubhouse, main room with seating for 300 persons and dance floor, library, billiards area, pool, card and game room are public accommodations, open to the public—including prospective home purchasers—and whose operation affects commerce.

68.    The Plaintiff mobile home owners live in the Park and visit the Park facilities on a regular basis. Plaintiff mobile home owners regularly encounter barriers (both physical and intangible) that interfered with - if not outright denied - their ability to use and enjoy the goods, services, privileges and accommodations offered at the Park. Plaintiff mobile home owners personally encountered the following barriers at the Facility:

    A.    There is no unassisted access to the public restrooms located inside the main Clubhouse building. Both the public restrooms in the clubhouse and the pool area have two doors to open, neither of which has any handicap assistance. The doors are heavy with automatic closures. They cannot be opened by a person in a wheelchair or using a walker;

    B.    The outdoor pool does not have a lift. The indoor pool lift has been inoperable for several years. It is battery operated. The battery is mounted in a charger on the adjacent wall. The battery indicates that it is charged but it will not operate the indoor pool lift;

    C.    The Sales/Rental Office is located in a mobile home in the Park and has no handicap accessibility.

EXHIBIT "A"

69.     Plaintiff mobile home owners were, and continue to be deterred from visiting the Clubhouse because they know that the Clubhouse's goods, services, facilities, privileges, advantages, and accommodations deny full and equal access to Plaintiff mobile home owners due to their physical disabilities. Plaintiff mobile home owners have learned that the following additional barriers to their full and equal access exist at the Facility, each of which relates to his disabilities:

Site Entrance Signage -

      A.    Site informational signage was not provided directing to the accessible entrance and route of travel.

Accessible Parking -

      B.    There are four handicap parking spaces: two near the main clubhouse building entrance; one near the rear entrance of the main clubhouse building; and one near the south end of the clubhouse parking lot near the entrance to the dog walk. These handicap parking spaces are of proper size and have ramps available to the sidewalk;

      C.    None of these handicap parking spaces have paint delineating the parking spaces. The parking space paint is faded completely. Nor is the remaining paint a correct color. Accessible parking access aisles are also not outlined in blue.

      D.    The "Van Accessible" signage is degraded and faded. Accessible parking signage mounted on the pole for the south most space is not 80" minimum above the surface. That sign is only 49" above the surface.

27

EXHIBIT "A"

Exterior Accessible Routes -

E.    A minimum of one accessible route was not provided from the public way to the accessible entrance.

F.    Sidewalk has raised lips that exceed 1/4" in height.

G.    Ramp at the end of the access aisle does not have edge protection on both sides of the ramp and exceeds 8.33%.

Accessible Doors -

H.    Entrance door thresholds exceed 1/2" in height.

I.    Handicap access to the main building is up a mild slope to a double door, one of which has power assist opening. These doors have no kickplate on the outside and a six inch kickplate on the inside. There is therefore, not the required smooth kick plate ten inch high on either door;

J.    From the clubhouse there is a handicap assist door to the patio between the main building and the indoor pool. However, a person cannot leave or enter the indoor pool building as there is no handicap assist on the indoor pool doors. Also, the gate to the outdoor pool and to exit from the area are not operable from a wheelchair;

Restrooms -

K.    The towel dispensers in the clubhouse restroom stalls are too high for a person in a wheelchair to reach. The Men's restroom towel dispenser is 60" from the floor, the Women's restroom towel dispenser is 58" from the floor. Both are partially blocked by the sink and commode. Both towel dispensers are mounted over an unused soap

28

dispenser. If the unused dispensers were removed, the towel dispenser could be ten to twelve inches lower.

General -

L.    There are no fire alarms, strobes, horns or sprinkler system in the main social events or large congregational ball room. There is no handicap access to the ballroom stage.

70.    Plaintiff mobile home owners live at the Park and must have ongoing access to the Clubhouse.

71.    The MHC/Equity LifeStyle Defendants knew or should have known that these elements and areas of the Clubhouse were inaccessible, violate state and federal law, and interfere with or deny access to the physically disabled. Moreover, the MHC/Equity LifeStyle Defendants have the financial resources to remove these barriers from the Park without much difficulty or expense, and make the Park accessible to the physically disabled. To date, however, the MHC/Equity LifeStyle Defendants refuse to either remove those barriers or seek an unreasonable hardship exemption to excuse non-compliance.

72.    At all relevant times, the MHC/Equity LifeStyle Defendants have possessed and enjoyed sufficient control and authority to modify the Park to remove impediments to wheelchair access and to comply with the 2010 Standards for Accessible Design. The MHC/Equity LifeStyle Defendants have not removed the impediments and have not modified the Park to conform to accessibility standards. The MHC/Equity LifeStyle Defendants have intentionally maintained the Park in its current condition and have intentionally refrained from altering the Park so that it complies with the accessibility standards.

73.    Title III of the ADA holds as a "general rule" that no individual shall be

29

discriminated against on the basis of disability in the full and equal enjoyment (or use) of goods, services, facilities, privileges, and accommodations offered by any person who owns, operates, or leases a place of public accommodation. 42 U.S.C. § 12182(a).

74.    The MHC/Equity LifeStyle Defendants discriminated against the homeowners represented by the Plaintiff by denying them "full and equal enjoyment" and use of the goods, services, facilities, privileges and accommodations of the Clubhouse during each visit.

75.    The ADA specifically prohibits failing to remove architectural barriers, which are structural in nature, in existing facilities where their removal is readily achievable. 42 U.S.C. § 12182(b)(2)(A)(iv).

76.    When an entity can demonstrate that removal of a barrier is not readily achievable, a failure to make goods, services, facilities, or accommodations available through alternative methods is also specifically prohibited if these methods are readily achievable. *Id*. § 12182(b)(2)(A)(v).

77.    Here, The homeowners represented by the Plaintiff allege that the MHC/Equity LifeStyle Defendants can easily remove the architectural barriers at the Park without much difficulty or expense, and that the MHC/Equity LifeStyle Defendants, when it was readily achievable to do so.

78.    In the alternative, if it was not "readily achievable" for the MHC/Equity LifeStyle Defendants Lake to remove the Park's barriers, then the MHC/Equity LifeStyle Defendants violated the ADA by failing to make the required services available through alternative methods, which are readily achievable.

79.    Plaintiff has been obligated to retain the undersigned counsel for the filing and prosecution of this action. Plaintiff is entitled to have reasonable attorneys' fees, costs and expenses paid by the MHC/Equity LifeStyle Defendants.

EXHIBIT "A"

**RELIEF REQUESTED**

Wherefore, Plaintiff respectfully requests the following relief:

1.      Enter judgment under the Americans With Disabilities Act, 42 U.S.C. §§ 12101, *et. seq.*, against the MHC/Equity LifeStyle Defendants for injunctive and declaratory relief;

2.      An order that the plaintiff be awarded its costs of this suit and reasonable attorney's fees.

3.      Award the Plaintiff such other and further equitable and legal relief as the Court deems just and necessary.

**VII.    JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all issues triable by jury.

September 29, 2020

<div style="margin-left:40%">

/s/ Daniel W. Perry
DANIEL W. PERRY
FBN: 376671
4767 New Broad St #1007
Orlando, FL 32814-6405
Tel: 407.894.9003
Fax: 407.650.3459
dan@danielperry.com
Attorney for Plaintiff

</div>

31

EXHIBIT "A"

COQUINA CROSSING HOMEOWNERS ASSOC. INC. V.
MHC OPERATING PARTNERSHIP, ET AL.,
CASE NO. 552020CA001041A000XX
**EXHIBIT A TO INITIAL COMPLAINT**

## COQUINA CROSSING
4536 Coquina Crossing Drive
Elkton, Florida  32033

| | |
|---|---|
| INTEGRATED PROSPECTUS | Approval No. PRMZ003399-P23186 |
| APPROVAL DATE: | August 9, 1996 |
| AMENDMENTS THROUGH: | September 30, 2002 |
| PARK OWNER: | MHC COQUINA CROSSING, L.L.C. |
| PERSON AUTHORIZED: | REGIONAL VICE PRESIDENT<br>Manufactured Home Communities, Inc.<br>28050 U.S. Highway 19 North, Suite 400<br>Clearwater, FL  33761 |

This Prospectus may be delivered to Tenants of this Park who became Residents on
or after August 9, 1996;

OR

Tenants who assumed the tenancy of such a Resident;

OR

Tenants who agreed to a        this Prospectus.

**EXHIBIT A**

STP:220625:1

**EXHIBIT "A"**

### COQUINA CROSSING
### July 1, 2001 Addendum
### to P2 Prospectus

Notwithstanding anything to the contrary in this prospectus, including the rental agreement, rules and regulations or any other exhibits to the Prospectus, the homeowner's proportionate share of pass-through charges shall be defined as:

"Proportionate Share" for calculating pass-through charges is the amount calculated by dividing equally among the affected developed lots in the park the total costs for the necessary and actual direct costs and impact or hookup fees incurred for governmentally mandated capital improvements serving the recreational and common areas and all affected developed lots in the park.

STP:238255:2

P2

EXHIBIT "A"

PROSPECTUS
FOR
COQUINA CROSSING

1. THIS PROSPECTUS CONTAINS VERY IMPORTANT INFORMATION REGARDING YOUR LEGAL RIGHTS AND YOUR FINANCIAL OBLIGATIONS IN LEASING A MOBILE HOME LOT. MAKE SURE THAT YOU READ THE ENTIRE DOCUMENT AND SEEK LEGAL ADVICE IF YOU HAVE ANY QUESTIONS REGARDING THE INFORMATION SET FORTH IN THIS DOCUMENT.

2. THE STATEMENTS CONTAINED HEREIN ARE ONLY SUMMARY IN NATURE.   A PROSPECTIVE LESSEE SHOULD REFER TO ALL REFERENCES,    ALL    EXHIBITS    HERETO,    THE    CONTRACT DOCUMENTS, AND SALES MATERIALS.

3. ORAL REPRESENTATIONS SHOULD NOT BE RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF THE PARK OWNER OR OPERATOR. REFER TO THIS PROSPECTUS (OFFERING CIRCULAR) AND ITS EXHIBITS FOR CORRECT REPRESENTATIONS.

4. UPON DELIVERY OF THE PROSPECTUS TO A PROSPECTIVE LESSEE, THE RENTAL AGREEMENT IS VOIDABLE BY THE LESSEE FOR A PERIOD OF FIFTEEN (15) DAYS.

STP:198492:4

P2

EXHIBIT "A"

COQUINA CROSSING

## INDEX OF CONTENTS AND EXHIBITS

INDEX OF CONTENTS AND EXHIBITS ..................................................................................... I

NAME AND ADDRESS OF COMMUNITY ............................................................................ 1

RECEIPT OF NOTICES AND DEMANDS ........................................................................... 1

DESCRIPTION OF COQUINA CROSSING PROPERTY ...................................................... 1

DESCRIPTION OF RECREATIONAL AND OTHER COMMON FACILITIES ......................... 3

COMMUNITY MANAGEMENT AND MAINTENANCE ........................................................ 5

REQUIRED IMPROVEMENTS TO THE MANUFACTURED HOME .................................... 6

UTILITIES AND OTHER SERVICES ................................................................................. 7

INCREASES IN RENT AND OTHER CHARGES .............................................................. 9

USER FEES ................................................................................................................... 12

COMMUNITY RULES AND REGULATIONS ................................................................... 12

ZONING CLASSIFICATION ........................................................................................... 13

AMENDMENT ............................................................................................................... 14

EFFECTIVE DATE ........................................................................................................ 14

LIST OF EXHIBITS ....................................................................................................... 14

ADDITIONAL INFORMATION/DETERMINATION DATE ................................................. 14

| EXHIBITS | DESCRIPTION |
|---|---|
| Exhibit A | Lot layout showing the location of the recreational areas and other common areas. |
| Exhibit B | Lease for rental of manufactured home lots in the Community. |
| Exhibit C | Community Rules and Regulations. |

EXHIBIT "A"

PROSPECTUS
FOR
COQUINA CROSSING

(In this prospectus, the term "manufactured home" shall have the same meaning as "mobile home" as defined in Section 723.003(3), Florida Statutes.)

## I. NAME AND ADDRESS OF COMMUNITY

The name and address of Coquina Crossing (the "Community") is:

Coquina Crossing
4536 Coquina Crossing Drive
Elkton, Florida 32033

## II. RECEIPT OF NOTICE AND DEMANDS

The owner of the Community is MHC COQUINA CROSSING, LLC, a Delaware limited liability company (the "Community Owner"). The community shall be managed by an individual designated by the Community Owner (the Community Manager").

The person authorized to receive notices and demands on behalf of the Community Owner is:

Regional Vice President
Manufactured Home Communities
5100 W. Lemon Street, Suite 308
Tampa, Florida 33609

## III. DESCRIPTION OF COQUINA CROSSING PROPERTY

A.  Number of Lots. The first section of Coquina Crossing will consist of 131 lots. Construction of th first section of Coquina Crossing began September 15, 1994 and was completed in 1995. Future sections of Coquina Crossing may have up to 700 lots for a total build out of 831 lots in the community.

B.  Size of Lots. The lots in Coquina Crossing are approximately 60 feet in width by 100 feet in depth. The exact dimensions of each lot have not been determined.

Lot sizes have been established only for the 131 lots within the first section of Coquina Crossing. These lots are identified as lots numbered one through one hundred thirty one inclusive.

C.  Setback and Separation Requirements. There are several legal requirements affecting location of manufactured homes within the Community.

The State Fire Marshall has established a minimum separation and setback requirements as follows: Pursuant to Section 4A-42.05, Florida Administrative Code, the State Fire Marshall has adopted the code of the National Fire Protection Association (the "NFPA"). The NFPA code sets forth minimum separation distance requirements between manufactured homes provide as follows:

EXHIBIT "A"

5-2.1          Fire Safety Separation Requirements.

5-2.1.1        Any portion of a manufactured home, excluding the tongue, shall not be located closer than 10 ft. (3.04 m) side to side, 8 ft. (2.44 m) end to side or 6 ft. (1.83 m) end to end horizontally from any other manufactured home or community building unless the exposed composite walls and roof of either structure are without openings and constructed of materials which will provide a one hour fire rating, or the structures are separated by a one hour fire rated barrier. (See 5-4.1)

5-4            Accessory Building or Structure Fire Safety

5-4.1          Requirements

A carport, awnings ramada, or open (screened) porch shall be permitted to be located immediately adjacent to a site line when constructed entirely of materials which do not support combustion and provided that such facilities are not less than 3 ft. (0.91 m) from a building, cabana, or enclosed porch on an adjacent site. A carport, awning, or ramada or open (screened) porch using combustible materials shall not be located closer than 5 ft. (1.52 m) from the site line of an adjoining site.

In addition to the requirements of the State Fire Marshall, St. Johns County PUD Ordinance No. 93-47, as modified by Ordinance No. 95-34, (the "PUD") and the Final Development Plan for Coquina Crossing Unit One approved by St. Johns County (the "FDP") establish certain setback and separation requirements that apply within the community.

Under the PUD and FDP, there is a minimum 25 foot front setback from the edge of curb and a minimum 10 foot rear setback. Adjoining homeowners are required to maintain a combined side yard of 10 feet with no side yard being less than 2 feet. Under the PUD and FDP all setbacks are measured from the exterior wall of the dwelling to the applicable parcel boundary. Accessory structures which are attached to the residence are considered part of the residence and subject to the same setback requirements as the residence. Accessory structures include garages, screened porches and utility rooms. Detached accessory structures are subject to the setback requirements established in the NFPA code. The maximum roof overhang is 2 feet. Any roof within 4 feet of a lot line must have a gutter to channel rainwater away from the lot line.

The requirements of the various governing agencies having jurisdiction in these matters may overlap or be inconsistent with one another. In addition, governmental rules or regulations are subject to amendment or repeal.

No representation is made hereby as to the interpretation of the various setback and separation requirements, nor as to the continuing applicability of such requirements after the date upon which the Prospectus is delivered to the tenant (the "Delivery Date"). There is no continuing obligation by the Community Owner to advise any Community Resident of any subsequent modification or future adoption of additional requirements by any governmental body.

D. Number of Lots Using Shared Facilities. The maximum number of lots which will use the shared facilities is 831. The shared facilities may also be used by up to 200 residents of any assisted care facility developed by the Community Owner or an affiliated entity ("Assisted Care Residents").

IV.   DESCRIPTION OF RECREATIONAL AND OTHER COMMON FACILITIES

A. Buildings. The Coquina Crossing recreational facilities will be located within the parcel designated Community Center on Exhibit A. The Community Center and the recreational facilities

EXHIBIT "A"

are referred to in this Prospectus as the Coquina Crossing Recreation Center.  The common recreation areas of the Coquina Crossing Recreation Center are:

| Building 1  -  Clubhouse | Approx. Size | Occupancy |
|---|---|---|
| Craft Room/Clinic | 1200 sq. ft. | 40 |
| Library | 600 sq. ft. | 40 |
| Wellness Center | 648 sq. ft. | 43 |
| Main      Hall/Multi-purpose room | 4,180 sq. ft. | 570 |
| Men's Rest Room | 300 sq. ft. | 10 |
| Women's Rest Room | 300 sq. ft. | 10 |
| Kitchen | 600 sq. ft. | 40 |
| Billiard/Card Room | 1,000 sq. ft. | 66 |

| Building 2  –  Indoor Pool | | Occupancy |
|---|---|---|
| Indoor  Heated  Pool,  Deck and Restroom | 3,200 sq. ft. | 200 |

B.  Swimming Pools.  The Coquina Crossing Recreation Center has two swimming pools. The first pool is an outdoor pool approximately 60 feet long and 30 feet wide.  The outside pool has a water capacity of approximately 60,000 gallons and will accommodate 60 people.  The outdoor pool is not heated.   The second pool is located inside of Building Two of Coquina Crossing Recreation Center and is 20 feet wide by 40 feet long.  The indoor pool has a water capacity of approximately 19,575 gallons and will accommodate 21 people.  The indoor pool is heated.  The two pools are surrounded by a single combined deck which is approximately 4,000 square feet with capacity for 275 people.  The whirlpool spa will be located near the pool deck area and the water will be heated.  The spa is approximately 8 feet in diameter, 4 feet deep and has a capacity of 5 people.

C.  Other Facilities and Permanent Improvements.    Other facilities and permanent improvements that will be available for use by the Community residents and their guests include:

1.  Roadways shown on Exhibit A;

2.  Two tennis courts in the Coquina Crossing recreation Center;

3.  Eight shuffleboard courts in the Coquina Crossing Recreation Center; and

4.  Eight horseshoe courts and two boccie courts in the Coquina Crossing Recreation Center.

D.  General Description of Items of Personal Property.    When the Coquina Crossing Recreation Center is completed the following items will be available for use by tenants of lots in the Community and Assisted Care Residents (the "Residents") and their guests including, in addition to those items described elsewhere in this paragraph, the following:

| Card tables | folding tables |
|---|---|
| folding chairs | couches |
| chairs | chair racks |

Approved 3/14/2000

EXHIBIT "A"

| | |
|---|---|
| refrigerators | stoves |
| coffee urns | pool tables |
| patio tables | pool side chairs |

These items may also be used from time to time by the Community Owner and its staff and guests. The Community Owner reserves the right, in the future, to add additional items, remove items, or substitute alternative items of personal property for use by Residents.

E.   General Description of Days and Hours of Operation. The recreation buildings and other amenities are generally open seven (7) days a week at 9:00 a.m. local time and are closed at 9:00 p.m. unless an evening activity has previously been scheduled with the Community Manager. Residents must make arrangements with the Community Manager in advance for use of the recreational buildings, the pools and pool areas and other facilities outside of the hours mentioned above.

The Community Manager may, from time to time, close the common facilities on a temporary basis for any reasonable purpose such as maintenance, repair, alteration or improvement. The Community Manager also reserves the right to use the common facilities, including the recreational buildings and to allow its staff, guests and licensees to use the common facilities for such activities as the Community Manager deems fit. However, the Community Manager will make a good faith effort not to schedule such use in a way that would conflict with an activity previously scheduled by Residents.

The Residents' right to use the common facilities and equipment described above does not include the right to use service and storage facilities associated with the common facilities such as heating, ventilating, air conditioning, electrical, pump, filtration, chlorination and storage rooms or areas.

The availability of all of the common facilities and equipment is limited to normal circumstances. The facilities may become unavailable in the even of natural or man-made disaster including fire, flood, storm, earthquake, explosion, war or civil disturbance, breakdown, repair or replacement of equipment or any other factor beyond the control of the Community Owner.

F.   Completion of Improvements. Construction of the Coquina Crossing Recreation Center, the two pools, one whirlpool, four shuffleboard courts, two tennis courts, four horseshoe courts, two boccie courts and pool decking commenced November 15, 1994 and have been completed. The remaining four shuffleboard and horseshoe courts will be constructed in connection with future phases of the Community. The Community owner reserves the right to change any of the common facilities or property by removal, relocation or alteration or by construction of new facilities.

## V.   COMMUNITY MANAGEMENT AND MAINTENANCE

The management of the Community is the responsibility of the Community Manager. The days and hours of operation of the Community Manager's office are available upon request from the office. All questions and problems concerning community operations should be directed to the Community Manager. Until there are two hundred homesites leased the Community Manager's office will be located in the sales office. The permanent location of the sales office has not yet been determined and when determined may be moved from time to time as homes are sold, however, all Residents will be advised in writing of the location and subsequent new locations of the sales office. The Community Manager's office may be relocated to the Coquina Crossing Recreation Center at the Community Manager's discretion.

Approved 3/14/2000

STP:198492:3

EXHIBIT "A"

The maintenance and operation of the common facilities described in Section IV above is also the responsibility of the Community Manager. However, Residents and their guests may use the common facilities only in a careful and reasonable manner, must leave such facilities in a clean, neat and sanitary condition, and must comply with the applicable rules attached as Exhibit C to this Prospectus (the "Community Rules"). Any problems which arise concerning the common facilities should be directed to the attention of the Community Manager.

## VI. REQUIRED IMPROVEMENTS TO THE MANUFACTURED HOME

Residents must install and maintain the following improvements and comply with the following requirements as a condition of tenancy in the Community.

1.    Manufactured home manufactured by a company whose products have been approved by the Community Manager.

2.    The manufactured home must have a shingled roof and lap siding approved by the Community Manager. A gutter will be required on any structure within four (4) feet of a lot line.

3.    The manufactured home must be anchored properly in compliance with the manufacturer's installation manual and the requirements of St. Johns County and the State of Florida.

4.    The manufactured home must be skirted with masonry decor block, brick, stucco or other materials approved by the Community Manager.

5.    A concrete driveway at least 12 feet in width and of sufficient length to provide minimum parking space of 40 feet.

6.    A garage approved by the Community Manager or a carport to be coordinated with the exterior of the home. Garages are required within unit one of the Community.

7.    A patio, veranda or glass-enclosed Florida room.

8.    The Lot must be sodded with the type sod approved by the Community Manager and a lawn sprinkler irrigation system approved by the Community Manager must be installed.

9.    The Lot must be landscaped according to a landscape plan approved by the Community Manager.

10.    Concrete, wood and/or stationary brick steps at each entrance to the manufactured home.

11.    Walks to each doorway must be paved or otherwise improved with a design approved by the Community Manager.

12.    Central air conditioning must be maintained in operating condition.

5

EXHIBIT "A"

These required improvements may be changed from time to time, and will be altered only in the manner prescribed by the rules of the Department of Business and Professional Regulation for amendments to this Prospectus. All Residents will be notified of such changes prior to their occupancy. All required improvements must meet specifications established by the Community Manager. Current specifications are available from the Community Manager's office.

In general and except as expressly provided to the contrary in this Prospectus, and to the extent permitted by law, each owner of a manufactured home in the Community is responsible for the maintenance and repair of his or her manufactured home, manufactured home lot and all improvements on the Lot.

## VII.   UTILITIES AND OTHER SERVICES

A. Potable Water.  Water is provided by the St. Johns County Utility Department and is billed by the Utility Department to each Resident based upon the amount consumed and is subject to a monthly minimum charge.  The method and schedule of billing is subject to change by St. Johns County from time to time.  Such billings also include charges by St. Johns County for sewage.  Responsibility for water mains in the Community from the entrance of the community up to and including the meter at each manufactured home lot is the responsibility of St. Johns County. The manufactured home owner shall be responsible for the expense of maintaining the water line between the manufactured home and the water meter (the "Service Lateral").  Any required maintenance to the Service Lateral shall be arranged by the Community Owner at the expense of the manufactured home owner.

B. Irrigation Water.  Presently, irrigation water is provided by the Community Owner and is included in the lot rental amount.

C. Sewage Disposal.   Sewage disposal is provided by the St. Johns County Utility Department.  It is billed based upon water consumption and is included in the same billing as water consumption.  The responsibility for the sewer lines up to each lot tap is the responsibility of St. Johns County.  The manufactured home owner shall be responsible for the expense of maintaining the sewer line between the manufactured home and the sewer tap (the "Service Lateral").  Any required maintenance to the Service Lateral shall be arranged by the Community Owner at the expense of the manufactured home owner.

D. Solid Waste.  Routine solid waste collection, recycling and disposal is provided by BFI, St. Augustine, Florida, a private contractor under contract with St. Johns County.   St. Johns County bills the Community annually for these services based on the number of homes.  Payment for these services is the responsibility of the homeowner and will be passed on to the homeowner.

E. Cable Television Service.   Cable television may be provided by an independent contractor and will be the homeowner's responsibility.

F. Storm Drainage.  On site storm drainage within the Community is provided by the Community and the cost of this service is included in the lot rental amount.  The St. Johns County Stormwater Management Utility created by St. Johns County Ordinance 94-16 manages and controls the public storm drainage system.  A pro-rata share of the charges of the Stormwater Management Utility, if any, for off-site storm drainage will be passed on as part of the lot rental amount to each manufactured homeowner in the Community.

G. Electricity.  Electricity is provided by Florida Power and Light Company at rates determined by that company from time to time based upon usage as measured by an electric meter

EXHIBIT "A"

located on each lot and is the responsibility of the homeowner. Electricity is not included in the lot rental amount.

H. **Telephone Service.** Telephone service is available from Bell South at rates determined by that company from time to time and is the responsibility of the homeowner. Telephone is not included in the lot rental amount.

I. **Basic Lawn Maintenance.** Basic lawn mowing service, semi-annual fertilization, and edging of the curb and drive are provided by the Community Owner and are included in the lot rental amount. Lawns are normally mowed where reachable by the Community's commercial lawn mowing equipment. Lawns will be mowed as frequently as required, depending upon the rate of grass growth, to maintain the general appearance of the Community, but not more frequently than once a week.

J. **Fire Protection.** Fire protection to the Community is provided by St. Johns County through the Hastings Volunteer Fire Department Station No. 8 located on Main Street in Hastings, Florida. In Resolution 94-39 the St. Johns County Board of County Commissioners indicated its intent to collect special assessments within a fire protection municipal service benefit unit that will include the Community. A pro-rata share of these special assessments will be passed on as part of the lot rental amount to each manufactured homeowner in the community.

K. **Other Services.** There is a security station located at the Community entry way adjacent to State Road 207 for the purpose of providing directions to Community visitors, to monitor egress and ingress from the Community, and to offer assistance when needed. The security personnel will not be a professional security force. This service is included in the lot rental amount.

The availability of all of the above utilities and services is limited to normal circumstances. One or more of the utilities or services may become unavailable in the event of natural or man-made disasters including fire, flood, storm, earthquake, war, civil disturbance or any other circumstance reasonably beyond the control of the Community Owner or the party providing such utility or service including strike, work stoppage, shortage of materials, shortage of fuel or breakdown, repair or replacement of equipment, and intervention of governmental authority.

The description of utilities and other services set forth above reflects the manner in which such services are provided and charged, and the parties responsible for the maintenance of the facilities necessary to provide such services, as of the filing date. The Owner reserves the right, upon 90 days prior written notice to owners of manufactured homes in the Community, to discontinue the provision for maintenance of any utility or other service described above that is presently provided and/or maintained by the Community. In addition, manufactured home owners within the Community may be billed separately for utilities or services that are billed to the community as of the filing date and/or may become responsible for the maintenance of utility facilities that are the responsibility of the Community Owner as of the filing date. The Community Owner reserves the right upon 90 days advance notice, to cause the manufactured home owners to be separately billed for these utilities or services either by installation of individual meters for each manufactured home lot or by a pro-rata share of the charges billed to the Community, or by a combination of the two methods.

## VIII. INCREASES IN RENT AND OTHER CHARGES

A. **Definitions.**

1. **Lot Rental Amount** means all financial obligations except user fees, which are required as a condition of occupancy within the Coquina Crossing Community. The lot rental

7

EXHIBIT "A"

amount includes the base rent, pass-through charges, pass-on charges and special user fees as defined below.

2. <u>Base Rent</u> means the primary monthly rent paid for occupancy within the Coquina Crossing Community. Base rent does not include special use fees, user fees, and other similar charges or assessments. Base rent may vary from lot to lot within the Community and will be increased annually.

3. <u>Pass-Through Charges</u> means the manufactured home owner's pro-rata share of the necessary and actual direct costs and impact or hookup fees for a governmentally mandated capital improvement, which may include the necessary and actual direct costs and impact or hookup fees incurred for capital improvements required for public or private regulated utilities. Pass-through charges may be assessed more often than annually. The manufactured home owner's pro-rata share will be determined by dividing the number of lots leased by the manufactured home owner by the total number of lots in the Community.

4. <u>Pass-on Charges</u> means the manufactured home owner's pro-rata share of ad valorem property taxes, special assessments, utility charges and any other governmental or utility charge currently known or unknown. One type of pass-on charge for which the homeowner is currently responsible is solid waste collection, recycling and disposal as discussed in Section VII(D) above. Certain pass-on charges may be assessed more often than annually as provided for in Section 723.031(5)(c) of the Florida Statutes.

5. <u>Special Use Fees</u> means those components of a lot rental amount which are separately itemized for specific services or privileges including, but not limited to, such charges as guest fees, pet fees, and guest badges, but not including user fees as defined in Section 723.003(12) Florida Statutes.

6. <u>User Fees</u> are those amounts charged in addition to the lot rental amount for non-essential optional services provided by or through the Community Owner under a separate written agreement.

B. <u>Base Rent</u>. The base rent for lot _____ is $_____ per month.

C. <u>Special Use Fees</u>. Special use fees currently charged to the manufactured home owner include:

1. A special service fee of $ _15.00_ per hour but not less than $_15.00_ per service call for any repair, maintenance, or service that is performed by the Community Owner, but which is the responsibility of the homeowner.

2. Each homeowner will be provided two permanent guest badges, free of charge. Additional guest badges (including replacement badges) are $ _7.50_ each and temporary guest badges require a deposit of $ _7.50_ each.

3. $ _16.00_ per person, per month, for each person over two persons occupying the manufactured home for longer than fifteen consecutive days or for more than a total of thirty days per calendar year.

4. A pet fee of $ _-0-_ per month per pet.

5. A late charge of $_15.00_ will be due on rent received on the 6th day of the month and an additional charge of $ _5.00_ per day will accrue thereafter until the rent is paid in full.

8

Approved 3/14/2000

STP:198492:3

EXHIBIT "A"

6. $_25.00_ per check for all returned checks.

7. New resident processing charge $_300.00_

8. Storm drainage $ _- 0 -_ .

9. Fire protection $ _- 0 -_ .

10. In the event the Community Owner is required to maintain or repair the water line between the manufactured home and the meter, or the sewer line between the manufactured home and the sewer tap, the manufactured home owner will be billed for the cost of such repair or maintenance.

D. Increases in Lot Rental Amount. One or more of the following factors may be considered in determining increases in lot rental amount.

1. Annual Increase in Base Rent. The level of base rent, special use fees, and other charges will be determined from time to time by the Community Owner. Except for certain pass-on charges, and pass-through charges, however, the lot rental amount will not be increased more frequently than annually, except for initial tenancies which commence after the beginning of the annual rental term. Commencing August 31, 1995 and each year thereafter, the base rental amount for leased lots charged during the preceding year may; at the option of the Community Owner, be increased by four percent (4%) or by the percentage increase in the consumer Price Index for the preceding calendar year, whichever is the greater amount. The "Consumer Price Index" (the "CPI") is defined as the United States Department of Labor Consumer Price Index, U.S. City Average – All Urban Consumers (1982-84 = 100). If the CPI is discontinued, then a generally accepted replacement may be substituted.

2. Factors Affecting Increases in Pass-Through and Pass-On Charges. The portion of the lot rental amount which is comprised of pass-on and pass-through charges, if any, as disclosed is the responsibility of the homeowner. These charges will be charged to the homeowner on a pro rata basis. New charges or the amount of an increase in these charges shall be limited to the increased cost or charges billed to the Community Owner by the Federal, State, Regional or Local Governmental Agency or utility company plus any maintenance and administrative costs relating to the same as permitted by Section 723.045 Florida Statutes.

3. Factors Affecting Increases in Special Use Fees. Factors influencing a level of increases in special use fees including, increased operating costs and the prevailing market and economic conditions at the time that notice of such increase is furnished by the park owner.

## IX. USER FEES

To obtain certain, non-essential, optional services, Residents may enter into written agreements for such services and will be responsible for the fees required in such agreements ("User Fees").

User fees may be increased based upon the factors upon which lot rental amount increases may be based. These factors are listed in Section VIII of this Prospectus. Notification of any increase in user fees will be given to Residents subscribing to the services for which the user fees are being increased. User fees may be changed at any time on thirty (30) days notice, unless a longer period is required by law. Notice will be deemed given upon placing in the U.S. Mail. Currently there are no user fees in the Community.

9

Approved 3/14/2000

EXHIBIT "A"

## X.  COMMUNITY RULES AND REGULATIONS

The current Rules and Regulations of the Community are set forth in Exhibit C.  Rules and regulations are subject to change, and new rules may be adopted, subject to the following procedure:

If the Community Owner desires to change a rule or adopt a new rule, it will give written notice to each affected manufactured home owner in the manner required by law at least 90 days before the effective date of the change; provided, however, that if the change or new rule is the result of restrictions imposed by governmental entities or is required to protect the public health, safety or welfare, it will become effective at the time specified in the rule, notwithstanding said 90-day period.

## XI.  ZONING CLASSIFICATION

The zoning authority which has jurisdiction over the land comprising the Community is St. Johns County, Florida.  The present zoning classification of the Community is Planned Unit Development pursuant to St. Johns County PUD Ordinance No. 93-47, as modified by Ordinance No. 95-34 (the "PUD").  The PUD allows the following uses with the Community:

1.  One manufactured home per manufactured home site up to a total of 748 homes;

2.  Recreational facilities;

3.  Maintenance building;

4.  Recreational vehicle storage area without hookups;

5.  Community offices, maintenance facilities, and sales facilities; and

6.  Up to 60,000 square feet of commercial development on a 6.5 acre parcel located on State Road 207 adjacent to and west of the entrance to the Community.  The allowable uses within the commercial area include, but are not limited to, various retail, services and office uses, restaurants (which may serve alcoholic beverages), churches, libraries, nursing homes, banks, commercial indoor recreational facilities, convenience store with fuel pumps and, the sale of alcoholic beverages.

The Community Owner has no present plans to seek any other changes in the use of the land comprising the Community.

## XII.  AMENDMENT

The Community Owner reserves the right to amend this Prospectus or any exhibit to this Prospectus from time to time to the extent permitted by law.  If required by law, the community Owner will file amendments with the Division of Florida Land Sales, Condominiums and Mobile Homes of the Department of Business and Professional Regulation of the State of Florida, and if so filed, the amendments will take effect at such time as is stated in the amendments, if permitted by law, or at the earliest time as is permitted by law.

Except as otherwise agreed to in writing by the Community Owner, all terms of the rental agreements in the Community expire at midnight on August 31 of each year.  Whenever a manufactured homeowner enters into a new rental agreement in the Community, the rental

EXHIBIT "A"

agreement will be subject to the form of Prospectus as amended at the time of the commencement of the rental agreement.

Notwithstanding the foregoing, any amendment made to this Prospectus or any exhibit for the purpose of correcting any errors or omissions in the Prospectus or any exhibits to the Prospectus, or to make the Prospectus or any exhibits to the Prospectus comply with the requirements of any local, state or federal laws or regulations, including but not limited to, the rules of the Department of Business and Professional Regulation, shall become binding upon all manufactured home owners at the time the amendment becomes effective.

## XIII.  EFFECTIVE DATE

All information provided in this Prospectus is provided as of the filing date of this Prospectus. The Community Owner assumes no responsibility to keep such information current, except as may be required by law. This Prospectus is not intended to provide all information about the Community, but to provide the minimum information concerning the community necessary to satisfy the requirements of Chapter 723, Florida Statutes.

## XIV.  EXHIBITS

Exhibits attached to this Prospectus are as follows:

Exhibit A       Lot layout showing the location of the recreational areas and other common areas.

Exhibit B       Lease for rental of manufactured home lots in the Community.

Exhibit C       Community Rules and Regulations.

## XV.  ADDITIONAL INFORMATION/DETERMINATION DATE

This Prospectus was determined adequate by the Division of Land Sales, Condominiums and Mobile Homes of the Department of Business and Professional Regulation of the State of Florida to be adequate to meet the requirements of Chapter 723, Florida Statutes, on August 9, 1996.

Amendment approved September 30, 2002.

The identification number assigned to this Prospectus is PRMZ003399-P23186.

This Prospectus applies to lot number _____.

The street address is _____

_____

ii                                          P2

EXHIBIT "A"



Phase 1

Community Center

EXHIBIT "A"

EXHIBIT B TO PROSPECTUS

LEASE

This Lease, entered into on _____, 20___, by and between MHC COQUINA CROSSING, L.L.C., a Delaware limited liability company d/b/a Coquina Crossing (the "Lessor") and _____ (the "Lessee").

WITNESSETH:

That the Lessor hereby grants and leases to the Lessee Lot _____ of Coquina Crossing of St. Johns County, Florida (the "Premises") together with the non-exclusive right to use the recreation halls and other common areas of the Community, and the right of ingress and egress over the roads in the Community. The Premises is to be used for the installation of Lessee's manufactured home as a private residence to be occupied solely by the following adults:

_____,    _____,
_____     _____,

All residents must meet the age requirements in accordance with the Community Rules. Any resident who violates this rule will be subject to eviction pursuant to Section 723.061 Florida Statutes.

The Premises is leased to the Lessee for the term and subject to the following terms and conditions:

1. **TERM.** The term of this lease shall be for a period of _____ months, _____ days, commencing on the _____ day of _____, 20____ and terminating on the 31st day of August, 20____. This lease shall automatically be renewed for successive additional terms of one year each unless the Lessee terminates the lease by written notice to Lessor thirty (30) days prior to the end of a term or unless the tenancy is terminated pursuant to the provisions of Section 723.061 Florida Statutes and Section 9 of this lease. Nothing in this Section of the lease shall be deemed to prohibit Lessor from changing the conditions of tenancy in accordance with the provisions of Section 723.037 Florida Statutes.

2. **RENT.** In consideration of the lease of the Premises, Lessee shall pay the Lessor as rent the sum of the following amounts:

(a) **BASE RENT** – The base rental amount during the initial term of this lease shall be $_____ per month, payable monthly in advance. The base rental amount during subsequent terms of this lease shall be as specified in written notice given by Lessor to Lessee ninety (90) days prior to the beginning of such term. At Lessee's option, he lot rental amount for each one year term may be paid in advance. Monthly rent payments shall be due on the first day of each month and shall be in default if not paid on or before the fifth day of each month. Timely payments shall be of the essence of this lease.

(b) **SPECIAL USE FEES.** Special use fees currently charged to the manufactured home owner include:

(1) A special service fee of $_____ per hour but not less than $_____ per service call for any repair, maintenance, or service that is performed by the Community Owner, but which is the responsibility of the homeowner.

EXHIBIT "A"

(2) Each homeowner must buy two permanent guest badges at $_____ each. Additional guest badges are $_____ each and temporary guest badges require a deposit of $_____ each.

(3)    $_____ per person, per month, for each person over two persons occupying the manufactured home for longer than fifteen consecutive days or for more than a total of thirty days per calendar year.

(4)    A pet fee of $_____ per month per pet.

(5) A late charge of $_____ will be due on rent received on the 6th day of the month and an additional charge of $_____ per day will accrue thereafter until the rent is paid in full.

(6) $_____ per check for all returned checks.

(7) New resident processing charge $_____.

(8) Storm drainage $_____.

(9) Fire protection $_____.

(10)    Damage to property fee $_____.

(11)    In the event the Community Owner is required to maintain or repair the water line between the manufactured home and the sewer tap, the manufactured home owner will be billed for the cost of such repair or maintenance.

(c) PASS-THROUGH CHARGES: The manufactured home owner will be responsible for payment of pass-through charges as defined in Section VIII A 3 of the Prospectus for Coquina Crossing delivered to Lessee pursuant to Chapter 723 Florida Statutes (the "Prospectus"). Pass-through charges may be assessed more often than annually and will be assessed to the manufactured home owner on a pro rata basis. The pro rata share will be determined by dividing the number of lots leased by the manufactured home owner by the total number of leased lots in the Community.

(d) PASS-ON CHARGES. The manufactured home owner will be responsible for payment of pass-on charges including ad valorem property taxes and utility charges. Additionally, the manufactured home owner will be responsible for increases in real and personal property taxes, direct and indirect costs of compliance with 723 Florida Statutes, the allocated costs of new or expanded recreation facilities, non-ad valorem assessments, and any other government or utility charge currently known or unknown. Two types of charges for which the home owner is currently responsible are off-site storm drainage and fire protection as discussed in Section VII F and J of the Prospectus. Certain of these pass-on charges may be assessed more often than annually as provided for in Section 723.031(5)(c) Florida Statutes.

3. OCCUPANTS. No person other than the Lessee, the spouse of the Lessee, and guests who have been approved by Community Management in accordance with the Community's screening procedures in effect from time to time and registered as guests may occupy the premises for more than thirty (30) days during the immediately preceding twelve (12) month period, nor for more than fifteen (15) consecutive days at any time.

STP:198426:3

EXHIBIT "A"

4. <u>RULES</u>.  Lessee shall abide by all of the Community Rules and Regulations, and shall assure that all persons on the premises as Lessee's guests, invitees, or visitors abide by such rules, and conduct themselves in a manner that does not disturb other Residents of the Community nor create a nuisance.  Lessee acknowledges that he has read and understands the Prospectus, including all exhibits and agrees to abide by and be bound by the Community Rules and Regulations which are incorporated into and made a part of this lease by reference.  Lessee acknowledges that Community Rules and Regulations, as amended from time to time, are covenants of this lease and are reasonable and necessary for the proper and efficient operation of the Community and for the protection of the life, health, safety, property and peaceful enjoyment of the Community by its Residents.  Lessee acknowledges that the Community Rules and Regulations may be amended by Lessor from time to time in accordance with the law.  Amendments to the Community Rules and Regulations shall take effect at the time specified by Lessor or after any period required by law.

5. <u>RIGHT TO ENTER</u>.  Lessor or its authorized agents shall have the right, but shall have no obligation, to enter Lessee's home on the premises in order to prevent imminent danger or injury to the occupant or damage to the home.  Lessee consents to such entry, and releases Lessor from any damage thereby caused to Lessee's home.

6. <u>EMINENT DOMAIN</u>.  If during the term of this lease any portion of the Lessee's lot is taken by eminent domain power or conveyed under threat thereof, Lessee may terminate this lease as of the date of taking, but shall have no right to any proceeds awarded as a result thereof.  Lessor shall prorate any rent received by Lessor from Lessee as of the date of taking as long as the Lessee is in full compliance with the rules and the payment of rent and charges as set forth herein.

7. <u>LESSOR'S DUTIES</u>.  Lessor shall maintain the common areas within the Community, provide basic lawn maintenance as described in the Prospectus, provide irrigation water, on-site storm drainage and security as part of the lot rental amount.  Lessor's maintenance of the common areas shall include provision of utilities for such common areas.

8. <u>DEFAULT</u>.  As allowed by Section 723.061 Florida Statutes, if a default shall occur, Lessor may, at its option:  cancel and terminate this lease by giving Lessee written notice, whereupon Lessee shall become a tenant at will and Lessor shall have the right to enter on and repossess itself of the premises; or retake possession of the premises for the account of the Lessee and hold Lessee liable for the difference between the rent due during the term and any rent recovered from a reletting; or pursue any other lawful remedy.

9. <u>EVICTION</u>.  The Lessor shall be entitled to evict the Lessee and the Lessee's manufactured home from the Community under the following circumstances:

> (a) Non-payment of lot rental amount in full within ten (10) days after it is due;
>
> (b) Conviction of Lessee of a violation of a federal or state law or local ordinance, which violation may be deemed detrimental to the health, safety or welfare of the other tenants;
>
> (c) Change of use of land comprising the Manufactured Home Community or a portion thereof, subject to any legally required notice to Lessee.
>
> (d) Failure of the purchaser of a manufactured home situated in the Community to be qualified as, and to obtain approval to become, a tenant in accordance with the Community Rules and the Community's screening procedures;

EXHIBIT "A"

(e)

    (1) A violation of any Community rule, provision of this lease or statute or ordinance which is determined to have been an act endangering life, health, safety, property or peaceful enjoyment of the Community or its occupants,

    (2) A violation or failure to abide by any Community rule, provision of this lease or provision of law, if the same violation is repeated or perpetuated within twelve months thereafter, providing Lessor has given Lessee the written notice required by law within thirty (30) days after the first violation. Failure of Lessee to correct the non-compliance or violation, within seven (7) days after delivery of the first notice, shall be deemed a second violation thereof;

(f) The occurrence of any other lawful ground for eviction.

    10. **NOTICES.** Any notice unless otherwise required by law, by Lessor to Lessee shall be deemed to be given when mailed to the Lessee's mailing address within the Community, or to such other address as Lessee shall have specified by written notice delivered to Lessor, or when given in any other way permitted by law. Any notice by Lessee to Lessor will be deemed to be given if sent by certified mail to the Lessor at the following address:

<div align="center">

Regional Vice President
Manufactured Home Communities, Inc.
28050 U.S. Highway 19 North, Suite 400
Clearwater, Florida 33761

</div>

    11. **WAIVER.** The rights of the Lessor contained herein are cumulative, and failure of the Lessor to exercise any right shall not operate to forfeit any other rights of the Lessor. No waiver by the Lessor of any condition or covenant of this Lease, any rules or regulations, or any other legal right shall be deemed to constitute or imply a further waiver of any other conditions or covenants of this Lease, any rule, or any other legal right.

    12. **PARTIES BOUND.** This Lease shall be binding upon and inure to the benefit of Lessor and Lessee, and their respective heirs, personal representatives, successors and assigns.

    13. **ENTIRE AGREEMENT.** This agreement represents the entire understanding of the parties with respect to the subject matter hereof. It supersedes all prior or contemporaneous agreements, understandings, inducements or conditions, express, implied or written. No termination, revocation, waiver, modification or amendment of this agreement shall be binding unless in writing and signed by all of the parties hereto.

    14. **SEVERABILITY.** In the event that any paragraph, subparagraph or provision of this agreement is held unenforceable by any court, this agreement shall be deemed to have been executed by the parties hereto with such paragraphs, subparagraphs or provisions not having been included herein, and the remainder of the agreement shall not be void thereby.

EXHIBIT "A"

15. <u>CONSTRUCTION</u>. In interpreting this Lease, all captions and titles shall be disregarded and when applicable, the singular of any word shall include the plural, the plural the singular, and the masculine and neuter genders shall include and apply to all genders. This Lease shall be interpreted, whether as to validity, capacity, performance or remedy, in accordance with the laws of the State of Florida.

Dated this _____ day of _____, 20_____.

WITNESSES:
As to signature of Lessor

_____

_____

LESSOR

MHC Coquina Crossing, L.L.C.,
a Delaware limited liability
company

By:      MHC Operating Limited Partnership,
          its sole member

By: _____
Name: _____
                Authorized Agent

WITNESSES:
As to signature of Lessee(s)

_____

_____

LESSEE

_____

_____

EXHIBIT "A"

Exhibit C

COQUINA CROSSING
4536 COQUINA CROSSING DRIVE
ELKTON, FLORIDA 32033

RULES AND REGULATIONS

Welcome to Coquina Crossing!  The following rules and regulations are intended for your comfort, welfare and safety and that of your guests and to maintain the appearance and reputation of our Community.  Please read these rules and regulations carefully and abide by them.  To achieve the stated purpose, they may be amended from time to one upon ninety (90) days written notice and pursuant to the terms of Section723.037, Florida Statutes (1995),

The Community is privately owned and we are required by law to abide by certain standards.  Many of our rules and regulations are based on the requirements of Florida law; the remainder are published to help assure the protection of your property and your privacy.

Your cooperation will be greatly appreciated.  These rules must be observed by all residents and guests.  Any rules posted at recreational facilities are deemed to be a part of these rules and regulations.

Consideration and courtesy to others, plus your cooperation in maintaining an attractive home, will sustain the high standards of the Community.

Please note that all homes sold and installed by MHC COQUINA CROSSING, LLC, a Delaware limited liability company, will meet the standards and include all required improvements under these Rules and Regulations.

### IMPROVEMENTS REQUIRED OF MANUFACTURED HOME OWNERS

1.    Each resident must install a manufactured home which has been constructed by a company whose products have been approved by the Community Manager.  The manufactured home must have a shingled roof and lap siding approved by the Community Manager.  A gutter will be required on any structure within four (4) feet of a lit line.  The manufactured home must be anchored properly in compliance with the manufacturer's installation manual, the requirements of St. John's county, the State of Florida, and all applicable laws.  The manufactured home must be skirted with masonry deco, block, brick, stucco or other materials approved by the Community Manager.  Management reserves the right to approve all home selections in order to ensure design standards and required improvements must meet specifications as established by the Community Owner.  Current written specifications are available at the Community Manager's office.  Required improvements are:

a.    A concrete driveway to the street, at lease 12 feet in width and of sufficient length to provide a minimum parking space of 40 feet.

b.    A garage or a carport to be coordinated with the exterior of the manufactured home approved by the Community manager.

c.    A patio, veranda, or glass enclosed Florida room.

EXHIBIT "A"

d.    Concrete, wood and/or stationary brick steps at each entrance.

e.    A fully sodded lawn and lawn sprinkler system approved by the Community manager.

f.    Landscaping according to a landscape plan approved by the Community manager.

g.    Walks to each doorway, paved or otherwise improved with a design approved by the Community Manager.

2.    Required improvements shall be maintained BY EACH HOMEOWNER. If a required improvement becomes damaged or destroyed for whatever reason, it shall be the homeowner's responsibility to ensure that the required improvements are repaired or replace immediately. All improvements must have the Community Manager's prior approval.

3.    If a manufactured home is substantially destroyed by fire or storm, the manufactured home owner shall promptly remove all debris from the lot and take all other action required to render the lot fully tenantable for another manufactured home. The manufactured home owner may then (at his or her option) install another approved manufactured home on the premises in accordance with the foregoing rules and regulations, or may terminate the lease without penalty or charge. If the owner fails to promptly remove all debris from the lot as required in these rules and regulations, within thirty (30) days after demand by the Community Owner, then the Community owner shall have the right to remove the debris and take action to make the lot tenantable and to charge the manufactured home owner the reasonable cost of such corrective action. Rents shall not be abated as a result of damage to or destruction of a manufactured home.. If a manufactured home is substantially destroyed by fire or storm and the manufactured home owner fails to make timely payment of the two (2) rent payments next falling due following the fire or storm, the manufactured homeowner shall be deemed conclusively to have surrendered the lease or rental agreement and abandoned the property situated on the lot, and the Community Manager shall be entitled to retake possession.

## ADMITTANCE, OCCUPANCY AND MINIMUM AGE

4.    A manufactured home may be occupied only by the owners of the manufactured home, approved lessee, registered guests for periods permitted by these Rules and Regulations, and other invitees and licensees not staying overnight. "Resident" as used in these Rules and Regulations refers to the owners of the manufactured home and approved lessees. Management reserves the right to refuse admittance to the Community to prospective residents including purchasers of existing homes within the Community. Prospective residents including purchasers of existing homes within the Community.   Prospective resident must be approved by the Community manager based upon (i) a completed questionaire provided by the Community Manager for this purpose, and (ii) and interview by the Community manager of all prospective occupants of the manufactured home.  In order to be admitted to the Community, applicants must be considered desirable and compatible with other residents of the Community. It is not advisable to sell a manufactured home to a prospective resident until the prospective resident has been approved by the Community Manager.

Approved prospective residents by the Community Manager is in no way intended to be a guarantee or warranty of the character of any prospective resident, and is not intended as a guarantee or warranty of the security of any existing resident, if a prospective resident becomes a resident in the community.

2

EXHIBIT "A"

5. In accordance with the Federal Housing for Older Persons Act of 1995 (as amended or modified from time to time, "HOPA"), the Community is intended to be and is operated as "housing for older persons". Under HOPA, "older persons" are defined as persons fifty-five (55) years of age or older. The Community complies with HOPA and is intended to be reserved for occupancy by persons fifty-five (55) years of age or older, with certain exceptions as allowed by HOPA. At least eighty percent (80%) of all occupied home sites within the Community must be permanently occupied by at least one person fifty-five (55) years of age or older as of the date of occupancy, and all residents of the Community must be at least forty (40) years of age. All prospective residents of the Community will be screened for compliance with these provisions, and no application for residency will be accepted without satisfactory proof of age such as a valid driver's license, birth certificate or passport. Under HOPA, management may, in its sole discretion, make certain exceptions to the foregoing provisions.

## CHILDREN AND OTHER GUESTS

6. Grandchildren and other young friends are welcome to visit, but their behavior must not inconvenience other Community residents. As a courtesy to other residents, children must be accompanied by a parent or other responsible person at all times. The resident host will be financially responsible for any property damage within the Community caused by their young visitors. Failure by the resident host to reimburse the Community Owner for damages caused by their guests shall be a violation of the Rules and Regulations of the Community, however such damages are not a part of the lot rental amount.

7. Visits by guests are limited to a total of thirty (30) days per calendar year, and no more than fifteen (15) consecutive days, unless an extension is approved by the Community Manager. Extra fees will be charged for any guests staying longer than thirty (30) days. Any guests remaining in the Community for more than thirty (30) days during the immediately proceeding twelve (12) month period or for more than fifteen (15) consecutive days at any time must be interviewed and approved by the Community Manager. All guests must be registered at the Community Office upon arrival in the Community. Residents are responsible for their guests. The Community Owner shall not be liable for accident or injury to the person or property of residents or their guests during the use of these facilities at their own risk. Guests are required to wear guest badges at all times when using Community facilities or equipment. Guests who are not overnight guests may not use recreation facilities more than four (4) days within each month. Notwithstanding the above, relatives under eighteen (18) years of age may visit longer than the prescribed thirty (30) days, but may not visit overnight in the Community more than sixty (60) nights during each calendar year, nor for a period of more than thirty (30) consecutive nights with at least thirty (30) days between such periods.

## RENTS AND FEES

8. All rental spaces are based on one or two occupants. In the event that more than two persons permanently reside in the premises, the rent will be increased by $ _15.00_ per month for each additional resident.

9. The rent for various lots within the Community may differ.

10. The standard rental period is from the first day to the last day of each month. Rent payments shall be due on the first day of each month and shall be in default if not paid on or before the fifth day of each month.

11. Payment may be made by mail or during office hours which are posted.

EXHIBIT "A"

12. COQUIINA CROSSING RENTAL RATES ARE ADJUSTED AS OF AUGUST 31 OF EACH YEAR IN ACCORDANCE WITH SECTION VIII OF THE PROSPECTUS.

### CARE OF HOME AND LOT

13. Fences or structural partitions are not allowed. Outside airing or drying of laundry is prohibited. Individual external TV, radio, or CB antennas are not permitted. Homeowners are required to maintain central air conditioning in operating condition.

14. Mail boxes will be installed by the Community owner. Maintenance or replacement of mail boxes, however, is the responsibility of the manufactured home owner. Replacement mail boxes and stands must be approved by the Community Manager.

15. No yard flagpoles are allowed. Permission to fly a single flag may be granted by the Community manager if the flag is displayed on a secured flagpole installed on the resident's manufactured home. No flag shall be greater than three feet by five feet. Only a United States flag or a flag of one of the fifty states shall be allowed.

16. Each homesite must be landscaped in accordance with a landscape plan approved by the Community manager. Landscaping must be arranged so as not to interfere with the use of riding lawn mowers. Once planted, all landscaping becomes the property of the Community Owner, but maintenance of the landscaping is the responsibility of the manufactured home owner. Shrubbery and other landscape features may not be removed without approval of the community manager. Trees must have either six feet of vertical ground clearance or edging at the tree drip line approved by the Community Manager. The Community Owner reserves the right to remove any trees, plants or other landscaping features that violate the foregoing rules.

17. The manufactured home owner is responsible for installing and maintaining an approved irrigation system. The Community provides irrigation water to each lot. The Community Owner reserves the right to alter its irrigation water policy to comply with conservation programs implemented or required by the State of Florida, the St. Johns River Water Management District, St. Johns County, or any other governmental entity having jurisdiction.

18. The Community Owner will provide basic lawn mowing services, including edging of the curbs and drives, to each lot provided, however, plants and trees shall be arranged so as not to interfere with the use of riding lawn mowers. The Community Owner will also provide twice yearly lawn fertilizing. All other maintenance of the homesite is the responsibility of the manufactured home owner including trimming plants, shrubs, flowers, and trees and for weeding and the general care of the lawn and landscaping. Residents are required to edge the grass around their home, patio, shrubs, and any other place where the lawn mowers do not reach.

19. All lot post lights are required to be left on every evening from sunset through sunrise for street lighting and security reasons. Lights and posts must be maintained in good working order by each manufactured home owner.

20. The resident is responsible for the overall appearance of the homesite. The homesite shall be kept in an orderly manner, neat, clean, and free of litter. The resident shall be responsible for keeping the homesite from creating an unsightly appearance. If the resident fails to maintain the appearance of the lot, the Community owner shall have the right to undertake necessary maintenance and to charge the resident for the cost of alleviating any unsightly appearance or a violation of these Rules and Regulations.

It is our common goal to insure that all manufactured homes in the Community are well maintained and attractive. Accordingly, it is a violation of these rules and of any lease or rental

4

Approved 3/14/2000

EXHIBIT "A"

agreement for a manufactured home owner to permit the appearance or a condition of their manufactured home to be substandard. "Substandard" means that the Community Manager has determined that the condition or exterior appearance of the manufactured home and appurtenances, or the appearance of the homesite, is materially below that of other homes in the Community. If the Community Manager determines that a manufactured home or homesite is substandard, it shall notify the manufactured home owner in writing. The manufactured home owner shall have two (2) months within which to correct the substandard condition. At the end of the period for corrective action, the Community manager shall again determine whether the appearance of the manufactured home or homesite remains substandard. If so, the Community manager shall issue a notice of violation to the manufactured home owner. The manufactured home owner shall then be allowed an additional period of one (1) month within which to take corrective action. If the Community Manager determines that the appearance of the home is substandard at the end of this period, the Community Manager shall issue a second notice of violation to the manufactured home owner and shall have the right to pursue any available remedy at law or in equity, including the right to terminate the lease and evict the resident. A manufactured home will be presumed to be substandard if it does not comply with applicable building codes or any specific community rule or regulation.

## PETS

21. Domestic cats, dogs weighing less than forty-five (45) pounds, and birds such as canaries and parrots are allowed upon written approval by the Community Manager and are subject to an additional fee.

22. Domestic cats and dogs must be kept on a leash at all times while outside.

23. No pet houses are allowed on any homesite. Pets cannot be tied or chained-up outside the home.

24. All unrestrained pets will be taken to the animal shelter.

25. In the event of justified complaints the pet owner will be warned once. On the second justified complaint the owner will be requested to remove the pet from the Community.

26. Pet waste must be picked up and disposed of properly. Drainage ditches, waterways, easements areas, and other portions of the Community property are not to be used as waste depositories.

27. Noisy or unruly pets will not be allowed to remain in the Community.

28. All pets must have current immunization shots as required by law.

## ACCESSIBILITY

29. The Community Owner reserves the right to erect, use, and maintain pipes and conduits in and through the premises, and to enter upon the premises during reasonable hours to examine the same and to make such repairs, alterations, improvements, or additions as the Community Manager may deem necessary or desirable, and to take all material into and upon the premises as may be required.

30. The Community Owner reserves the right of access to and over all lots at all reasonable times for the purpose of inspection, utility, maintenance, and for administration and operation and protection of the Community. The Community Manager's right to enter the premises shall not exceed the rights granted under Florida Statutes Chapter 723. Each resident agrees to permit, in

STP:19B501:2

5

Approved 3/14/2000

EXHIBIT "A"

emergency situations, entry upon the premises, or into resident's manufactured home, to prevent imminent danger to an occupant of the manufactured home, or to the manufactured home without rendering Community Owner or its agents liable.

## CONSTRUCTION OR ALTERATION

31. All plans for any construction or alteration must be submitted to and approved by Community Manager prior to construction. All building products must be new material and must comply with all applicable building codes. Construction work must be done by licensed contractors. The Community manager may refuse to approve any site improvements, including storage or utility buildings. Any approved site improvements shall be at the sole expense of the resident.

## UTILITIES

32. Residents will pay all charges not included in lot rental amount including charges for potable water, electricity, telephone, and other utilities used on the homesites, and all installation fees, including meters and electric pedestals and other such servicing from mains or main lines as may be necessary.

33. The Community Owner shall not be liable for any damages resulting from temporary interruption of utility services. Hot water heaters should be equipped with an anti-syphon valve to avoid damage to the hot water heater in the event of interruption of water service and the Community Owner shall not be liable for any such damage. Resident shall promptly repair or cause to be repaired any defective plumbing, electrical or other parts of the manufactured home.

## MOTOR VEHICLES

34. The speed limit in the Community is 15 m.p.h. Advise your guests, as you are responsible for violations by your guests. Pedestrians have the right of way, bicycles second, and automobiles third. Be considerate and safety conscious. Major repairs or maintenance on vehicles within the Community is prohibited. Joy riding, horn blowing, loud engines and improperly maintained vehicles (junkers) are not allowed.

35. Motorbikes, mopeds, or motorcycles shall not be allowed within the Community except with the prior written consent of the Community Manager. Golf carts must be registered at the Community Office.

36. No vehicle shall be parked on the grass or patio. No on-street parking is permitted with the exception of temporary parking for guests when a social gathering creates a short-term parking deficit. Automobiles and approved vans shall be parked in the carport, garage, or driveway. A van must always be the first vehicle parked in carport or garage and only one approved van per home is permitted. Vans which are designed primarily for the transportation of people, do not exceed the standards o f 86 inches in height, 80 inches in width, and 233 inches in length, and have no appendages such as air conditioning units, gas bottles, etc., shall be approved by issuance of a written permit from the community manager confirming that the van meets the requirements. Travel trailers, motor homes, commercial vehicles, boats, boat trailers, and utility trailers are not allowed to be parked on the streets, driveways, in the carports or garages, or anywhere within Coquina Crossing, except that travel trailers or motor homes may be parked while loading or unloading only for a maximum of two (2) nights and any such vehicles may be parked in an area designated by the Community Manager with the express written consent of the Community manager. Community decals for automobiles are only available for residents and their registered vehicles.

EXHIBIT "A"

## NOISE/DISTURBANCES

37.    Residents and guests are expected to conduct themselves in a dignified and neighborly manner. Residents are requested to keep noise levels from whatever source to a minimum, especially between the hours of 10:00 p.m. and 8:00 a.m. Noise which can be heard outside of any lot will be considered too loud. Complaints filed with Community Manager by other residents considered as evidence of a violation of these Rules and Regulations.

## REFUSE

38.    All garbage must be sealed in plastic bags before placing in garbage cans. Garbage and rubbish must be kept in the garbage-hide or utility room until the morning of pickup. There shall be no burning of trash, leaves or other materials within the Community. Grass cuttings leaves, trimmings and other debris must be placed in containers adequate for pickup. Cuttings such as limbs must be cut into three foot sections and tied. All trash removal such as furniture, rugs, etc. is the responsibility of the resident.

## PROHIBITION OF SOLICITING AND COMMERCIAL ENTERPRISES

39.    Selling, soliciting, peddling or engaging in commercial enterprises within the Community are not permitted. No commercial advertisements may be displayed in the Community. If any solicitors bother you, please notify the Community Manager immediately. No commercial or professional business may be conducted within the Community by any resident and no manufactured home may be used for any purpose other than as a residence. Notwithstanding the foregoing, canvassing and the other activities described in Section 723.054(3), Florida Statutes (1993), are permitted.

## MAINTAINING PARK STANDARDS

40.    The Community Manager must maintain Community standards. Any manufactured home owner whose home is not maintained in conformance with Community standards is subject to Notice and Eviction Provisions of Section 723.061, Florida Statutes.

## RESALES AND SUBLETTING

41.    Lot leases are not transferable. Residents selling their homes cannot guarantee prospective buyers a site in the Community. Buyers must be approved like any new resident. Management will not deny the resident the right to sell resident's manufactured home within the Community. A prospective purchaser must submit and application prior to purchasing a manufactured home in the Community. The Community Manager will review each application. If the buyer does not qualify, the manufactured home must be moved from the Community. All new residents must meet the age requirements. A new resident processing charge of $_____ will be charged for the purpose of reissuing security passes, credit checks, processing the resident's application, verifying information provided by the new resident executing a new lease as otherwise provided in the Lease Agreement and Prospectus.

42.    To control traffic and security, any home offered for sale must be registered with the Community Manager before a "For Sale" sign is displayed. Forms for this purpose are available at the Community Office. "For Sale" signs may only be displayed inside the window of the mobile home.. One "For Sale" sign for a particular home may be placed on the home itself. No single dimension of any such sign may exceed 18 inches.

7

43. Lots within Coquina Crossing may not be subleased and manufactured homes within the Community may not be leased except with the Community Manager's prior written approval of the prospective resident(s). Such approval may be withheld at the Community Manager's sole discretion.

## COMPLAINTS

44. All notices and complaints must be in writing and signed by the resident, addressed to the Community Manager. Consideration of the complaint by the Community Manager will be conducted in a fair and reasonable manner.

45. Rule infractions will be brought to the resident's attention by the Community Manager.

## EVICTION

46. The Community Owner may evict a manufactured home owner or a manufactured home only on one or more of the grounds provided in this section.

a. Nonpayment of lot rental amount in full when due and if default continues for five (5) days after written demand by the park owner for payment of the lot rental amount;

b. Conviction of a resident of a violation of a federal or state law or local ordinance, which violation may be deemed detrimental to the health, safety, or welfare or other residents of the Community.

c. Violation of a Community rule or regulation, the Lot Rental Agreement, or Chapter 723 of the Florida Statutes.

d. Change in use of land comprising the Community or a portion thereof.

e. Failure of the purchaser of a manufactured home situated in the Community to be qualified as and to obtain approval to become a resident, if such approval is required by a properly promulgated rule.

f. Any other manner provided for in Florida Statutes section 723.061, as subsequently amended, or successor statute.

47. Any first violation of a rule or regulation which a court finds to endanger life, health, safety or property or the peaceful enjoyment of the Community may terminate a resident's occupancy with seven days' written notice. The resident shall remove all structures from the space site and leave the site in an orderly condition.

## MISCELLANEOUS

48. The discharge of firearms is prohibited anywhere in the Community.

49. The illegal and/or excessive use of drugs, and/or alcoholic beverages is prohibited anywhere in the Community. Drunkenness or public intoxication is prohibited. Disorderly conduct, use of abusive or offensive language, or any act which endangers the life, health, safety, property, or peaceful enjoyment of Coquina Crossing or its residents, is also prohibited in the Community and violations may lead to eviction.

50. Swimming or the use of motorboats is prohibited within the stormwater drainage systems, including all lakes, anywhere in the Community.

51. When leaving the Community for an extended period, the resident should file a departing notice at the Community Office with certain information such as how to contact the resident in the event

EXHIBIT "A"

of an emergency and the name of the person who will be responsible for maintaining the lot in the resident's absence. Use of foil, corrugated cardboard, paper, or sheets to cover windows and glass doors in the homeowner's absence creates an unsightly appearance and is prohibited. Shades, drapes, and awnings are suggested for this purpose.

52. The Community Owner shall not be responsible for loss or damages whether caused by accident, fire, theft, Act of God, or any other means to any manufactured home, person or personal property.

53. Office hours will be posted on the Community Manager's door except for holidays and special occasions when the office is closed.

54. Residents and guests shall comply with all applicable laws, statutes, regulations and ordinances, including building, housing, and health codes.

55. All manufactured home Community tenancies are governed by these rules whether a written lease is in effect or not.

56. The provisions of the Community Rules and Prospectus are incorporated into the executed lot rental agreement by reference as if set forth verbatim.

## ACCEPTANCE BY RESIDENT

I acknowledge that I have read and understand the foregoing rules and regulations, and that, by depositing the site rental and taking possession of the lot assigned to me by the Community Manager, I accept and hereby agree to comply with these rules and regulations, as well as all applicable federal, state and local laws and ordinances.

| | |
|---|---|
| WITNESS | RESIDENT |
| | |
| WITNESS | RESIDENT |
| | BY: |
| | COMMUNITY MANAGER |

STP:198501:2

Approved 3/14/2000

EXHIBIT "A"

Case 3:21-cv-00084-MMH-LLL    Document 1-1    Filed 01/22/21    Page 63 of 88 PageID 70

CA20 - 1041

# A G R E E M E N T

This agreement (the "Agreement") is made this _____ day of _____, 2012 (the "Effective Date") by and between MHC Coquina Crossing LLC ("Owner") and Coquina Crossing Homeowners Association, Inc. (the "HOA") and its negotiating committee created pursuant to Section 723.037(4), Florida Statutes, (the "Negotiating Committee") (the HOA and the Negotiating Committee collectively the "Association") (the HOA, the Negotiating Committee and the Owner collectively the "Parties").

## R E C I T A L S

A.    Owner owns and operates Coquina Crossing, a manufactured housing community located in St Johns County, Florida (the "Community").

B.    In May of 2012, Owner intended to serve homeowners of the Community (each a "Homeowner" and collectively, the "Homeowners") and the board of directors of the HOA, with a legally sufficient notice of lot rental increase (the "Notice") providing for an increase in lot rental amount effective September 1, 2012. The Notice was to provide for an increase in base rent of the greater of Four Percent (4%), or the increase in the consumer price index (CPI-U, 1982-1984 = 100) (the "Increase").

C.    In advance of the Notice, the HOA created the Negotiating Committee pursuant to Section 723.037(4), Florida Statutes, to meet and

1

EXHIBIT B

EXHIBIT "A"

negotiate with Owner concerning the Notice and other matters. Following good faith negotiations between the Parties, an Agreement was reached as specified below. The Parties intend that this Agreement shall be considered a contract between the Parties within the meaning of Section 723.038(6), Florida Statutes. This Agreement shall be binding upon the Parties and all Homeowners on the Effective Date (the "Included Homeowners") subject to any limitations stated below.

Now, therefore, in consideration of the foregoing recitals (which are accurate, material and incorporated into this Agreement), the mutual promises and covenants set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    **Base Rent Increases**.  In consideration of the release provided in paragraph 8, the Increase is being reduced from the amounts provided in the Community's prospectuses [an increase in base rent of the greater of Four Percent (4%) or the increase in the consumer price index (CPI-U, 1982-1984 = 100)], to a lesser increase. Accordingly, the annual increases in base rent for the period September 1, 2012 through August 31, 2013 shall be reduced to Two Percent (2%) per site per month over the previous year's base rents.

2

EXHIBIT "A"

The foregoing amounts shall be payable without set-off or escrow whatsoever.

2. **Other Charges**.   The limitations on base rent increases specified in numbered paragraph 1 above shall not affect any fees, charges or assessments other than base rent.  Owner reserves the right to charge, increase or decrease any other fees, charges and/or assessments (collectively "Fees") available under the Community's prospectuses and any other Fees permitted by law.  Such Fees may include, but shall not be limited to, special use fees, government and utility charges, pass through charges and pass on charges.

3. **Waiver and Notice**.  If the Association contends that Owner is in violation of this Agreement, the prospectus or rental agreement governing any Homeowner's tenancy, or Chapter 723, Florida Statutes (any or all of which a "Non-Compliance"), the Association shall notify Owner of any such alleged Non-Compliance, including the particulars of the facts giving rise to and constituting such alleged Non-Compliance, within thirty (30) days of the date the Association receives reasonable notice of such facts.  Owner shall have fifteen (15) days from receipt of any such notice to cure the alleged Non-Compliance and, upon completion of any such cure, Owner shall be deemed not to have been in default or in violation.  Association shall provide

3

to Owner any such notice of alleged Non-Compliance by certified mail properly addressed to the community manager at the community office <u>with a copy</u> sent by certified mail to Owner, c/o Equity Lifestyle Properties, Inc., Attention: Legal Department, 2 North Riverside Plaza, Suite 800, Chicago, IL 60606. The Notice and opportunity to cure provisions stated herein shall be a condition precedent to any legal,

4. **<u>Attorneys' Fees; Litigation; Integrity of Agreement</u>**. In the event of any litigation between Owner and the Association relating to or arising out of this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party all costs and expenses of any nature, including, but not limited to, attorneys' fees, expert fees, and other taxable and non-taxable costs and expenses, both at the trial and appellate levels; provided, however, the foregoing shall not apply to any statutory meeting with Owner, subsequent mediation or to any proceeding by or on behalf of any former or current Homeowner seeking to invalidate or otherwise dispute the validity of this Agreement. The Association and Owner agree to mutually enforce this Agreement and cooperate fully in the event the validity or integrity of this Agreement is attacked or disputed by any such Homeowner.

EXHIBIT "A"

5.    **Dispute Resolution; Waiver of Jury Trial**.    Any controversy or claim arising out of or relating to this Agreement, its interpretation, construction, breach or enforcement hereof, shall first require non-binding mediation pursuant to Chapter 44, Florida Statutes.    In any proceeding arising out of or relating to this Agreement, the parties waive trial by jury.

6.    **Association Release**.    The Association, on its behalf and on behalf of each Homeowner as such Homeowner's representative, hereby releases Owner, Equity Lifestyle Properties, Inc., Manufactured Home Communities, Inc., MHC Operating Limited Partnership, and their parents, affiliates, subsidiaries, officers, directors, agents, stockholders, members, attorneys, successors and assigns from any and all claims, actions or causes of action of any kind whatsoever ("Claims"), whether legal, equitable, administrative, or otherwise, which the Association now has or ever had including, but not limited to, Claims involving or relating to rents, services, maintenance, or Owner's compliance with or delivery of the Community's prospectuses, rental agreements, as well as any other alleged violation of Chapter 723, Florida Statutes. The Claims shall specifically include all claims, actions, causes of action, or reduction in service arising or in any related to the lack of an indoor pool from approximately August 2011.

EXHIBIT "A"

**Applicability of Prospectus, Rental Agreement and Chapter 723, Florida Statutes**.  Each Homeowner's tenancy shall be governed by his or her prospectus and rental agreement.  In the event of any conflict between a Homeowner's prospectus or rental agreement and this Agreement, this Agreement shall control.

8.    **Entire Agreement; Modification**.  This Agreement constitutes the entire agreement of the Parties hereto with respect to the subject matter hereof.  This Agreement supersedes all prior and contemporaneous discussions, negotiations, conditions or understandings relating to the subject matter hereof.  This Agreement may not be amended or modified except by an instrument in writing signed by all Parties hereto.

9.    **Further Assurances**.  The Parties shall, at any time and from time to time following the execution hereof, confirm the validity of this Agreement, and execute and deliver all such further instruments and documents and take all further actions as may be reasonably necessary or appropriate in order to carry out or more effectively satisfy the intent and purposes of this Agreement.

10.    **Representations; Binding Effect**.

EXHIBIT "A"

      **a.**   <u>**By Owner**</u>.  Owner represents that it is authorized to enter into this Agreement.  This Agreement shall be binding upon Owner, its successors and assigns.

      **b.**   <u>**By the Association**</u>.  The Association represents that it is a duly incorporated Homeowners' Association and Negotiating Committee created and maintained pursuant to Sections 723.075 through 723.079, Florida Statutes.  The Association represents that the negotiating committee was created in strict compliance with Section 723.037(4), Florida Statutes. The Association enters into this Agreement on its behalf and on behalf of each   Homeowner of the Community as such Homeowner's representative pursuant to Sections 723.075(1) and 723.079(1), Florida Statutes.

    **11.**   <u>**Execution in Counterparts**</u>.  This Agreement may be executed in counterparts.

[signatures on the following page]

7

EXHIBIT "A"

**OWNER**

_____

_____

By: _____

Its: _____

Date: _____

**HOA**

_____

_____

By: _____

Its: _____

Date: _____

EXHIBIT "A"

**NEGOTIATING COMMITTEE**

_____

_____

_____

_____

_____

Date:_____

EXHIBIT "A"

Case 3:21-cv-00084-MMH-LLL    Document 1-1    Filed 01/22/21    Page 72 of 88 PageID 79

CA20 - 1041

**NETWORKING FOR PROGRESS**
**MEETING NOTES**
**SELECT COMMITTEE/ELS**
**Meeting date:  3-28-13**

Through the combined efforts of ELS Regional Executives and the Select Committee of Networking for Progress, the following information is provided:

1.  ELS will provide name, address, phone number and site number of new residents, providing that they agree to fill out the "Voluntary New Resident Information form".
2. The "Voluntary New Resident Information form" will have an attached Introduction to the HOA, if provided by the HOA.
3.  HOAs will be provided the information required in Chapter    723.037 (1), regarding 90 day notice of rent increase.  (all affected homeowners, which may be by lot number, name, group, or phase). ELS typically sends this information by lot number but makes available by name to be viewed in the office.  Upon written request from the HOA Board, we will provide the information including names. HOAs not putting the request in writing may still access the information by visiting the Managers office.
4. Upon request, ELS will provide the percentage of residents meeting the reporting requirements of HOPA, (55+ communities) - the percentage of occupied sites in the community that have at least one person over the age of 55. The personal data used to arrive at the percentages will not be provided.

FYI

CapX budgets are determined by input from residents, local Managers, Regional Managers and Vice Presidents, while final decisions are made in meetings with upper management in Chicago.  Capx budgets can be modified based on the needs of all ELS properties, so that emergencies can be addressed.  Larger capx projects may be delayed due the the involvement of the Asset Management group, whereas smaller projects are typically overseen by the regional manager or manager. Permitting can cause delays also.

Contracts for services, i.e. lawn service, may be delayed due to the involvement of the Procurement Department.

Regional Managers may refuse to work with a company even if they are approved for other areas.

Training programs for community managers are developed in Chicago, with additional input provided by Vice Presidents and Regional Managers.

Every community manager undergoes an audit annually.  Audits focus on accounting issues along with theft and fraud prevention.  Customer service monitoring is the


EXHIBIT "A"

responsibility of the operations group, from the community manager to the regional manager to the vice president.

Both Credit/Criminal checks are done as a condition to being approved for residency in an ELS community. ELS hires a service to do these checks. Background checks include employment verification as well as landlord and/or mortgage verification. A new computer system currently being introduced will not permit a felon to be approved for residency by a manager, unless an override is provided at the Vice President level.   An example of a legitimate override reason would be for a felony that occurred 20 years ago with a clean record since then . The manager does not have the authority to approve felons for residency.    Residents will not undergo a new background check when moving to another location within the community or when moving to a different ELS community.  Qualifications for renters (if allowed per prospectus) are essentially the same as for home owners, but are, in practice, more strict, since a renter's rent would be higher than that of a homeowner.  There are section 8 residents being approved in some parks.

Caregivers and pets (claimed as medically necessary) are treated essentially the same.  A form must be filled out by a doctor, saying they/it are medically necessary as a reasonable accommodation, and the doctor would be willing testify in court to that effect.  Approval will not be given without the signed form.

ELS standardized the Long Term Agreement 3-4 years ago but has made some minor tweaks to it as needed.  The only thing that will change from community to community will be the amount of the increase and the term.  There will be no wish lists included in future LTAs, strictly rent.  Wish lists (to be included in the Capx budget), are to be discussed with the manager and regional manager at the quarterly meetings (which must be requested).

ELS hires a third party real estate tax consultant every year to    evaluate tax situations, based on trim notices.  The study is used to determine if ELS will appeal or not.


ATTACHMENTS INCLUDED WITH NOTES:
- Voluntary Submission – New Resident Info form
- Introduction to the HOA – Sample Letter


*It is agreed that these notes are to be distributed to all ELS manufactured home community managers, regional managers, and Vice Presidents in Florida by Eric Zimmerman; and these notes are to be distributed to all Networking for Progress Select Committee and general members by Jan McMeans.*

EXHIBIT "A"

NEW RESIDENT INFORMATION

I (We), hereby, voluntarily ask that my (our) name(s), address and contact number(s) be given to the _____ _____ for the purpose of allowing them to contact me (us). This information will not be distributed to other entities for any purpose.

_____    _____

Address                                                                                          Site #

_____    _____

Name                                                                        Phone #

_____    _____

Name                                                                        Phone #

_____    _____

Name                                                                        Phone #

_____

Date

EXHIBIT "A"

WELCOME

ANYTOWN HOMEOWNERS ASSOCIATION

Florida Statute, Chapter 723, mandates that a Homeowner's Association be created for the purpose of representing the homeowners in all manners relating to Chapter 723.

The Anytown Homeowners Association will represent you and insure that the community owners adhere to the provisions of FS-723 including, in some cases, the negotiation of rental agreements.  It is for that reason we encourage you to become a member.

In addition to the activities of the HOA, we are also privileged to have activities sponsored by the
Men's Club
Women's Club
Camera Club
Collectors Club

A member of the Homeowner's Association will be contacting you shortly and arrange to provide you with a schedule of all activities, a list of all committees and the names and contact information for the Board of Directors of The Anytown Homeowners Association.


At that time we will gather information needed to represent you effectively.

Sincerely,

HOA President

EXHIBIT "A"

**NETWORKING FOR PROGRESS**
**MEETING NOTES**
**SELECT COMMITTEE/ELS**
**Meeting date: 6-13-13**

Through the combined efforts of ELS Regional Executives and the Select Committee of Networking for Progress, the following information is provided.

HOA involvement vs., ELS responsibility:
Direct supervision of employees, rule enforcement, selection of vendors and/or services and the scope of a project are all the responsibility of ELS.

Even though a resident may be highly qualified in the areas mentioned above and wish to become involved, it is ELS that is financially and legally responsible for the management of their communities.  Legitimate concerns regarding management should be brought to the attention of management.

RULE ENFORCEMENT
ELS agrees that it is responsible for rule enforcement, and acknowledges that staff and management are under the same rules and regulations as residents (per 723.022 Mobile home park owner general obligations. (5) Comply with properly promulgated park rules and regulations and require other persons on the premises with his or her consent to comply therewith and conduct themselves in a manner that does not unreasonably disturb the park residents or constitute a breach of the peace).  One exception, for example, is that a manager ~~or~~ and his family ~~is~~ are exempt from the HOPA (over 55 age) requirement.  Per 723.035 Rules and Regulations (1) A copy of all rules and regulations shall be posted in the recreation hall, if any, or in some other conspicuous place in the park. The HOA should work with the community manager to determine the best location, and the HOA should notify the community manager if the copy ever needs to be replaced for any reason.  There should be a copy available for review in the office as well.


We need to point out that all new resident should make themselves aware of the rules and regulations prior to moving into our communities, and it is a resident problem that rules HAVE TO BE ENFORCED.  It is obvious, in other communities, when the residents have pride in their homes and the community.  WE SHOULD ALL MAKE THIS A PRIORITY. The most visible and common rule violations are:
Carport clutter, weeds, mold growing on the outside of the home, and installation of forbidden items, for example, fences, stone covered yards, air conditioners in lanai windows, and widened driveways with gravel or concrete blocks.  NOTE:
HOA's/Residents can't complain about the value of our homes, and allow these rule violations to exist.  The ELS communities that are maintaining the value of their homes seldom experience the rule violations listed above.   Cleaning up the community solves

EXHIBIT "A"

two problems, and they should be apparent.  #1.  Increases the value of the homes.  #2. Eliminates the problem of enforcing rules and regulations.

**NOTE;  IT MAY BE WORTHWHILE TO ORGANIZE A CLEANUP EVENT IN YOUR COMMUNITY** -

Residents should be reminded that, it is not their responsibility to enforce the rules. Violations should be reported to the manager.  Residents should have a clear understanding of the managers responsibility  and when it is necessary to call outside authority such as the police, the health dept, the dog catcher, etc.  The ELS VP's present agreed **that the rules and regulations will be enforced to the prospectus standards and that management can always do a better job with enforcing the rules and regulations of the communities.  Dawn and Eric agree to focus on this area with the regional managers and community managers in Florida and to make it a point of emphasis. They have agreed to include this statement in these meeting notes which will be distributed to all of the regional managers and community managers as well as Networking for Progress members, so that everyone is aware of the importance of this issue.**

There are some communities that have rules that have become outdated, and HOA's are working to get them changed.  Eric stated that hopefully, at some time in the future, a uniform set of rules and regulations could be worked on, for all ELS communities in Florida

**REMINDER: PER 723.037, HOA's WILL RECEIVE 90 DAYS NOTICE OF ANY CHANGES TO THE RULES AND REGULATIONS AND HAVE THE RIGHT TO DISPUTE ANY CHANGES WITH WHICH IT DISAGREES.**

Eric and Dawn confirmed that ride arounds and 360 inspections are still being done. Ride arounds are expected to be done monthly and 360 inspections are expected to be done twice a year.  HOA representatives are encouraged to ride around with the manager while he/she reviews the community for non-compliance.  It is not the job of the HOA rep to point them out.  Simply to observe.  (Eric and Dawn, the section stating HOA representatives are encouraged, is taken from actual notes from the meeting we held with Brad on November 8, 2009.  Since that exact statement has been sent out to the Networking for Progress members since that date, we felt it was important to re-emphasize the issue exactly as Brad stated it).

Because of the vast array of circumstances in rule violations there is no "one size fits all" procedure in place to address them.  Depending on the situation the manager may, address the issue by phone, e-mail, letter or a personal visit.

Suggestions were made that a standard procedure be put in place but ELS explained the difficulty in doing so due to the variations of the violations.  There was  a recommendation from the committee that it would be beneficial if a sit down meeting were held with  an alleged violator before "last resort" eviction proceedings were initiated.

EXHIBIT "A"

Violations regarding safety are given priority.  Otherwise there is no classification.  Other than those involving safety, one type of rule violation is given no preference over another.

Repeated public drunkenness or commitment of a violent act were two examples of conduct that could lead to an eviction.  There is a paragraph in most prospectuses to the effect:  Noise or conduct that disturbs the peaceful enjoyment of the Community by Residents or which constitutes a nuisance to other residents or which constitutes a breach of the peace is prohibited.

Eviction may be pursued by management as a result of violating the resident conduct clause.

**MANAGEMENT DISCRETION**

Discussion took place regarding allowances for the installation of those items not approved in the prospectus. Because of the turnover of community managers and the variation of their discretion,  items previously approved may be viewed as eye sores. It was agreed that the management discretion provision be used sparingly, if at all.

Due to the fact that managers may be responsible for more than one community, some communities feel not enough time is spent with them to review current issues.  If after communicating this to the manager, time is not allocated to address the issues, a complaint should be filed with the regional manager. Following the complaint procedure through, if necessary.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FYI:

Dawn shared that CAPX budgets had been frozen for a short period of time.  They have currently been re-opened with some projects being shifted.   It was stated that 50% and closer to 75% of projects are actually unbudgeted.   It is estimated that more than half of the projects completed in a typical year are unbudgeted due to unforeseen and/or unexpected projects.  For example, a clubhouse air conditioner may be expected to have a useful life of 10 years, but if it breaks in year 7, it has to be replaced, even if it was not budgeted.

The question was asked " what happens when rentals increase and what effect is there on the values of other owned properties"?  The answer was that ELS is putting a stronger emphasis on sales as a result of some improving economic indicators. in the last 90 days sales and rentals were 50/50%, whereas in the past, the majority of move-ins were rentals due to economic conditions.  Sales prices are trending up.  In the past lack of financing has affected values more than rentals. but now ELS is seeing multiple lenders re-enter the market.

Rental home contracts are for one year and do not have automatic renewal.  Also, the new homes in the community that do not meet the standards of the prospectus are for rentals. Determinations will be made at the point of purchase how adjustments to prospectus standards will be met.

EXHIBIT "A"

Present: ELS: Eric Zimmerman, Dawn Rumpf
        SELECT COMMITTEE: Luanne Putnam, Judy Hale, Lynn Mercer, Walt Stone,
        Dee Gleason, Dick Miller, Stan Jablonski, Jan McMeans
Present via Skype:  Dan Aubin, Vince Malorni
Absent:  Hank Curran, Tony Pinzone, Bob Sweitzer, Dick Gebo

EXHIBIT "A"

**NETWORKING FOR PROGRESS**
**MEETING NOTES**
**SELECT COMMITTEE/ELS**
**Meeting date: 9-12-13**

Through the combined efforts of ELS Regional Executives and the Select Committee of Networking for Progress, the following information is provided.

Notes from 6-13-13 were reviewed with minor changes.

The subjects of ride arounds and the new resident procedure were tabled for further review. Both will be added to the agenda for the next meeting.

Water main breaks: happen more frequently due to the age of some of our communities. There exists a varying array of circumstances: in some communities the City is responsible, in others it may be City/County, in some it is the responsibility of the residents or ELS. A major concern with water main breaks is the decision whether to shut the water off to the residents. Where ELS is responsible, every effort is made to try and fix the problem immediately. Some communities have their own maintenance crew, and it would be the maintenance supervisor (in consultation with the community manager) who would decide whether to fix it immediately or not. Decisions in the past have been to not do repairs on the weekend that would result in employee overtime (for example - a pinhole leak can wait while a rushing geyser cannot). There has been a freeze on funds thru the third quarter, relief is expected by October. Eric stressed that no essential or emergency services would be affected during the freeze - only discretionary items (i.e. budgeted purchasing of mulch may be postponed to the next quarter). It would be extremely difficult to replace all the water lines throughout a community. Larger pipes can be relined after running cameras thru to locate the problems. Water lines for individual sites are more difficult to run a camera through due to the small size.

Long Term Agreements: were discussed, first with the ELS definition being a rental agreement that may change the terms of the prospectus. This was not an in depth discussion of rental agreements but was brought up because several communities are reporting that ELS has refused to meet and discuss long term agreements. We were reminded by Eric that they are actually required to meet just once and that should be within the thirty days (as requested) after receiving the 90 day notice per FS, Chapter 723.037. Eric pointed out that the negotiating committee has the full authority to sign the long term agreement.

Discussion of meeting notes prior to release: The subject of discussing the meeting notes prior to release took place. It was later determined that discussion alone is not a problem. We ask that items in the notes not be enacted until such time as they are released to both the HOA's and ELS representatives. The goal is for everyone to be on the same page.

EXHIBIT "A"

ELS advertising:  it was pointed out that ELS is using the same pictures from one community in ads for several other communities.  If you think this is occurring at your community, please let the manager know.

Eric made the point that registration as a 55+ community is not required.

ELS restructuring:  recently (in September) ELS restructured the supervision of all MH communities in Florida.  Eric Zimmerman and Dawn Rumpf are Vice Presidents of Florida.  Leslie Taylor-Rharbi and Sara Whittington were both promoted to Senior Regional Managers.  Jeff Fannon is now assigned to the Chicago office, working with the company's internet technology requirements.

Sex offenders, Felons and unauthorized residents:  It was reported that some communities have had problems with residents that were not supposed to be approved.  723.061 Evictions; ground, proceeding. - (b) Conviction of a violation of a federal or state law or local ordinance, if the violation is detrimental to the health, safety, or welfare of other residents of the mobile home park.  The mobile home owner or mobile home tenant must vacate the premises within 7 days after the date the notice to vacate is delivered.  This paragraph constitutes grounds to deny an initial tenancy of a purchaser of a home under paragraph (e) or to evict an unapproved occupant of a home.

This continues to be a problem; many times a resident takes in a relative without going through the approval procedure.  If you believe this to be an issue at your community, please report it to the manager.  This, more than any other issue demands that the complaint procedure be followed:  If you have followed the three part complaint procedure with no results, send copies to Eric Zimmerman, registered receipt, and he assures us he will address it and respond to you.  Eric pointed out that it is often difficult to get an eviction based upon a rules violation such as an unauthorized resident.

When residents are known to be hiding someone not authorized for residency, not answering the phone, not answering the door, etc., a registered letter will be sent regarding unauthorized residents.  If a response is not forthcoming, ELS will work thru the attorney and request that they move out, following the legal process for eviction.  Sometimes it comes down to management's word vs. the resident.  It may be necessary to get neighbors to testify about the violation on behalf of management.

When rent payment is received in a name other than what's on record, a note will be sent saying "we accept your rent, but it does not assure your residency".  The question came up regarding residents that rent from ELS that may bring children in to live with them.  As stated above - if you believe this to be an issue at your community, please report it to the manager.

EXHIBIT "A"

According the FS, Chapter 723.022, Mobile home park owner's general obligations. - (5) Comply with properly promulgated park rules and regulations and require other persons on the premises with his or her consent to comply therewith and conduct themselves in a manner that does not unreasonably disturb the park residents or constitute a breach of the peace.  It was agreed that this means ANYBODY on the premises must comply with the park rules and regulations.  Another example given was: a concrete truck started mixing and pouring concrete at 7:10 am.  The community prospectus has a noise restriction from 10:00 pm to 8:00 am.  Even though the county has a special starting time for concrete work of 7:00 am, the community prospectus prevails.

2014 Schedule of Networking for Progress/Select Committee/ELS meetings was discussed.  Colony Cove and Ridgewood Estates have generously offered to continue hosting the meetings.

Present:
ELS:  Eric Zimmerman, Leslie Taylor-Rharbi
SELECT COMMITTEE:  Robert Frank, Dee Gleason, Judy Hale, Bob Hogan, Stan Jablonski, Lynn Mercer, Dick Miller, Bob Sweitzer, Jan McMeans
Present via Skype:  Vince Malorni
Absent:  Hank Curran, Tony Pinzone, Walt Stone, Dick Gebo, Dan Aubin

EXHIBIT "A"

**NETWORKING FOR PROGRESS**
**MEETING NOTES**
**SELECT COMMITTEE/ELS**
**Meeting date: 11-21-13**

Through the combined efforts of ELS Regional Executives and the Select Committee of Networking for Progress, the following information is provided:

New Resident Procedure:
We will continue using the existing new resident form, with the suggestion that community managers encourage new residents to sign.

Ride around inspections:
ELS developed the "Manager Site Inspection Monthly Report" (copy enclosed) that will reflect the month, date and the date inspections were completed. It will also report the number of homes inspected for the month, the number of violations cited and whether any were second and third cited violations.
HOAs may request to see the monthly report. Ride around inspections may be done by any on site ELS employee. **Once each quarter** a member of the HOA board may request (from the manager) that they ride around (as an observer only) to gain a better understanding of the process and how management evaluates violations .Charges are being assessed for violations that are not addressed by the homeowner and processed as part of the rent. The prospectus for your community will determine if this type of assessment is acceptable. In my particular prospectus it appears under BASE RENT AND OTHER CHARGES: Service Fee   $_____per hour, but not less than $_____ per service call, for any repair, maintenance or service that is performed by the Community on behalf of Resident. Some prospectuses may not have similar language, therefore management's only recourse to resolve a violation may be eviction.

360 Inspections:
A review of all sides of the mobile home is a 360 inspection, done twice a year. There are no provisions for HOA involvement, mentioned only as another step in the process to keep homes up to the requirements of the community.

Statutory meeting with ELS:
Chapter 723.037, clearly defines when the owner is required to meet with the HOA, it is within 30 days after receipt of the statutory 90 day rent increase notice.

LTA:
Future LTAs will be reviewed by in house counsel. It was pointed out that the language in the LTA, particularly that referring to the waiver,  is one of the reasons that communities are not signing the agreement. Eric pointed out that that paragraph refers only to situations that have occurred to that point (NOT FUTURE SITUATIONS). If there are issues serious enough that you are considering legal action against ELS they should be discussed (prior to signing the agreement) in an effort to work them out. The

EXHIBIT "A"

purpose of the waiver is after working out a favorable agreement in good faith, they (ELS) don't want to be faced with a lawsuit.

Remember, if you previously signed the long term agreement (LTA) (containing the clauses referenced above), when the LTA expires, so do the terms of those clauses, UNLESS the LTA contained language stating otherwise.  Communities with CPI (only) based increases typically don't have long term agreements.  Eric explained that the release for ELS in the LTA speaks to the many reasons somebody may choose to sue them.  The reason the HOA isn't offered the same release is because there don't appear to be any reasons why ELS would want to sue them.
 Long Term Agreements may vary, but are typically three years.  Rounding of rent increases are determined by the prospectus for the community, some allow rounding up to one (1) dollar, some allow up to five (5) dollars.

There are no penalties for not signing the long term agreement.

Market, CPI, home sales and a variety of economic factors are taken into consideration to determine rates of increase, not the expected return to stockholders, as suggested.

Managers seldom seen:
In some communities the managers are seldom seen.  As the face of ELS, managers should be out in the community at least weekly.  Managers will meet with the HOA monthly, regional managers will meet with the HOA quarterly, if requested.  This is not to say that all communication should cease with the above exceptions, it is expected that each will approach the other with an attitude of cooperation and respect.

Understanding rules and regulations:
Many times residents don't fully understand the rules and regulations. The regional manager will (upon request by the HOA) review the rules and regulations with the board.  The board could then pass the information on to their residents.  The quarterly meeting with the regional manager would be a good time to do this.  Community managers and regional managers have copies of the rules and regulations and the prospectus for their communities.

Wish lists:
(Capx budget requests) should be started by July of the current year, for the following year.  It depends on a lot of factors but should generally be approved by the first of the following year. The question was asked "do managers have discretionary funds".  While there is not a surplus fund, managers and regional managers work together to reallocate budgeted funds, as needed, to address unanticipated expenses that may arise during the year.

Registration on FCHR website:
 Regional Assistants of ELS send in a registration to the FCHR-Florida Commission on Human Relations along with a check for the annual fee.  The owners of age qualified

EXHIBIT "A"

communities need to do this annually to maintain the 55+ status on the commission's website.  Confusion exists regarding this process due to the example (on the FCHR website) showing it being done by the Homeowners Association.  Note:  Further information regarding the requirements of a housing facility or community to qualify as housing for persons 55 years of age or older, may be viewed on the internet by entering Housing for Older Persons Act of 1995, Chapter 100.306, Intent to operate as housing designated for persons who are 55 years of age or older.  This information should also be incorporated into booklets prepared for effective leadership by Home Owners Associations.

An issue called "right of first sale" (giving ELS the opportunity to sell your home) was mentioned but the ELS representatives present were not familiar with it.


Present:
ELS: Leslie Taylor-Rharbi, Sara Whittington-McFarland, Dawn Rumpf, Eric Zimmerman
Select Committee:  Dan Aubin, Judy Hale, Stan Jablonski, Vince Malorni,
Lynn Mercer, Walt Stone, Bob Sweitzer, Jan McMeans

Absent:  Hank Curran, Robert Frank, Dick Gebo, Dee Gleason, Bob Hogan
Dick Miller, Tony Pinzone

EXHIBIT "A"

**Manager Site Inspection Monthly Report**

Month:_____

Date:_____

Inspections completed
   by:_____

_____ # of sites inspected this month

_____ # of violations cited this month

_____ # of second/third  (follow-up) violations cited

EXHIBIT "A"

CA20 - 1041

SELECT COMMITTEE/ELS

MEETING NOTES

2-19-2015

*Through the combined efforts of ELS Regional Executives and the Select Committee of Networking for Progress, the following information is provided.  Please note: though it is the intention that these notes address common issues and concerns, it is still the prospectus/lease/rules and regulations for each resident and community that take priority for any situation that may arise.*

*Brad Nelson, Senior Regional Vice President, Eastern Region retired in December, but was our guest on the 19th, which gave us the opportunity to thank him for his support.  Brad was always above board and stood by his unwavering position.  Dale Almond, the new Senior Regional Vice President also attended. Dale is from Arizona and is accustomed to much warmer weather than what we've been having.  Dale hasn't had a need for a winter coat for a long time, until his arrival in Florida.  Let's all hope it warms up as he transitions to his new position.*

1. Heirs on the lease will continue the same lease as their parents/relatives.  Heirs not on the lease will be treated like a resale buyer – they can assume the remainder of the lease term and then will go to the then market rent.  Currently, spouses not on the lease do not automatically become leaseholders.   This is being addressed by current legislation, introduced by FMO and is projected to become effective July 1, 2015.

2. Relocating resident policy:  ELS's policy regarding relocating residents is the same as addressed in the LTA under <u>Homeowners Affected by this Agreement; Transferees.</u>  If.....any included Homeowner transfers or sells any legal or equitable interest in such Homeowner's mobile home to any transferee or resale purchaser (collectively, a "Transferee"), the Transferee shall be permitted to assume such included Homeowners rental agreement but only for the remainder of the annual lease term then in effect between the included Homeowner and Owner.  Upon the expiration of such annual lease term the Transferee's rent shall be adjusted to the Community's then prevailing market rate....."

   Which is basically the same as FS Chapter 723.059 (3) The purchaser of a mobile home who becomes a resident of the mobile home park in accordance with this section has the right to assume the remainder of the term of any rental agreement then in effect between the mobile home park owner and the seller............

   It should be noted that residents relocating within the community that are purchasers of ELS inventory homes won't have a lease to assume and will start their new lease at market rent but are eligible for any rent concession programs being offered to new residents at that time.

3. Quarterly meetings:  There appears to be confusion regarding the intent of the quarterly meetings.  There are four quarters in a year.  ELS want you to be able to meet with your regional manager once during each quarter.  Example: If the HOA board meets with the regional manager in January, your next meeting can be in April, May or June.  Many HOA boards have been upset because they felt, after meeting in January, they absolutely had to meet in April and their requests were not able to be honored.  To clarify:
   (a)  The HOA board must request the meeting quarterly.  *We suggest scheduling the meetings for the upcoming year.*
   (b)  The HOA board will create an agenda and present it to the community manager with a copy to the regional manager, at least a week in advance (common courtesy).  This allows time for all expected participants invited to the meeting to be prepared.
   (c)  Agenda definition:  a list of items to be discussed.  There is no requirement to list each "question" that's going to be asked.  The purpose of the agenda is to list the topics to be discussed.  There are no limits as to what can be discussed nor are there limitations on the age of an issue.  The exception being an item previously discussed with the determination by ELS that no action be taken.  Topics not on the agenda may be discussed if time permits.
   (d)  The HOA board should be given the opportunity to provide input to the capx budget for their community by June or July.  If, information <u>regarding the approved capx budget has not been provided by now, request it from the manager.</u>  Requests for ELS contributions to HOA events may also be discussed.

EXHIBIT "A"
**EXHIBIT D**

(e) Notes should be taken for the purpose of following through on topics discussed.  Recordings are not permitted by ELS.

4.  It is not the policy of ELS to pass the cost of removing *dead and dangerous* trees on to the resident.  Understand this is a very different issue from *maintaining* trees.

5.   Insurance:  Liability insurance is required by ELS if the HOA holds functions where liquor is served or where the public is invited.  HOA's that are required to have liability insurance are required to provide a copy of the policy to ELS, listing them as a co-insured.   If a private resident party includes people from outside the property, and/or is serving liquor, the private resident is required to provide proof of insurance.  Attached is a form that ELS community managers utilize to provide specifics for amounts of insurance and language for co-insured that is required.

6.  Care givers require approval and a background check.  Two different situations exist.  One, the care giver moves in with the resident requiring care.  This can be a family member, or not, young or old.  The other is when the resident is the care giver and moves another person, family or not, into their home.

Note:  The following subjects have been advanced to the next meeting for further discussion:
ELS sharing policy, boil water notice, underage survey, and new resident information.


Present:
ELS: Dale Almond, Brad Nelson, Leslie Taylor-Rharbi, Dawn Rumpf, Eric Zimmerman

Select Committee: Robert Frank, Judy Hale, Bob Hogan, Bill Krimson, Vince Malorni, Lynn Mercer, Walt Stone, Bob Sweitzer, Jan McMeans.

Absent:  Dan Aubin, Dee Gleason, Hank Curran

EXHIBIT "A"