Filing # 114158521 E-Filed 09/29/2020 11:33:56 PM

IN THE SEVENTH JUDICIAL CIRCUIT, IN AND
FOR ST. JOHNS COUNTY, FLORIDA

COQUINA CROSSING
HOMEOWNERS ASSOCIATION,
INC., in its representative capacity
on behalf of itself, and all current and
former mobile homeowners in the Park,

      PLAINTIFF,                CASE NO.   CA20 - 1041

Vs.

MHC OPERATING LIMITED
PARTNERSHIP, EQUITY
LIFESTYLE PROPERTIES, INC.,
MHC COQUINA CROSSING,
L.L.C., ERIC ZIMMERMAN,
GENA MAY, JARED LAMBERT,
WILLIAM SMOLJANOVICH,
MARTA LINDSTROM, FLORIDA
MANUFACTURED HOUSING
ASSOCIATION, INC., JOSEPH
ALLEN BOBO, AND LUTZ,
BOBO & TELFAIR, P.A.,
D/B/A LUTZ, BOBO, TELFAIR,
EASTMAN & BOBO, F/K/A
LUTZ, WEBB & BOBO, P.A.,

      DEFENDANTS.

_____/

## COMPLAINT AND DEMAND
## FOR JURY TRIAL

EXHIBIT "A"

## TABLE OF CONTENTS

| | | | Page |
|---|---|---|---|
| **I.** | **INTRODUCTION** | | 3 |
| | A. | Representative Action by the Coquina Crossing HOA | 4 |
| | B. | The Nature of the Product or Service: "55 or Older" Mobile Home Park | 5 |
| | C. | Sam Zell, Chairman of Equity Lifestyle, Likes the "Oligopoly" Nature of the Mobile Home Park Industry | 5 |
| | D. | Geographic Area or the Market: St. Johns County, Florida | 6 |
| **II.** | **DEFENDANTS** | | 6 |
| | A. | The MHC/Equity LifeStyle Defendants | 6 |
| | B. | The FMHA Trade Association Defendant | 9 |
| | C. | The Lutz Bobo Law Firm Defendants | 9 |
| **III.** | **JURISDICTION AND VENUE** | | 9 |
| **IV.** | **ACTS IN FURTHERANCE OF THE CONSPIRACY** | | 10 |
| | A. | Extort Adoption of an Illegal Rental Agreement | 10 |
| | B. | Fraudulent and Unreasonable Lot Rental Categories & Amount | 16 |
| | C | Defendants Impose Illegal Fees and Charges | 17 |
| | D. | Unreasonable Elimination or Reduction of Services | 17 |
| **V.** | **COUNT 1:   FLORIDA ANTITRUST ACT** | | 20 |
| **VI.** | **COUNT 2:   VIOLATION OF THE ADA** | | 25 |
| **VII.** | **JURY TRIAL DEMANDED** | | 31 |

EXHIBIT "A"

The Coquina Crossing Homeowners Association, Inc., in its representative capacity on behalf of itself, and over 900 current and former mobile homeowners in the Coquina Crossing Mobile Home Park ("Park"), by and through the undersigned counsel, bring this Complaint against these Defendants, divided into three descriptive relationships:

- The **MHC/Equity LifeStyle Defendants**: Defendants MHC Operating Limited Partnership, a foreign (Illinois) limited partnership, Equity LifeStyle Properties, Inc., a foreign (Maryland) corporation, MHC Coquina Crossing, L.L.C., a Delaware limited liability company, Eric Zimmerman, an individual, Gena May, an individual, Jared Lambert, an individual, William Smoljanovich, an individual, and Marta Lindstrom, an individual;
- The **FMHA Trade Association Defendant**: Florida Manufactured Housing Association, Inc., a Florida corporation;
- The **Lutz Bobo Law Firm Defendants**: J. Allen Bobo, an individual, and Lutz, Bobo & Telfair, P.A., a Florida corporation.

The individuals and entity defendants described above are collectively referred to in this Complaint as "Defendants." The Plaintiff further alleges:

## I.    INTRODUCTION

1.    Beginning at a time uncertain, but as least as early as 2011, and continuing on through the present time, the Defendants have entered into and engaged in a conspiracy, combination, or concert of action in unreasonable restraint of trade and commerce within the State of Florida and elsewhere with effects in the State of Florida in violation of § 542.18, *Fla. Stat.*, by agreeing to the following:

3

EXHIBIT "A"

A.   Extort adoption of an illegal rental agreement;

B.   Imposed fraudulent and unreasonable lot rental categories and amount;

C.   Defendants Impose Illegal Fees and Charges; and

D.   Unreasonably eliminated or reduced services.

Engaging in the business of owning and operating mobile home parks within the State of Florida constitutes trade or commerce within the meaning of Chapter 542, *Fla. Stat.*

2.     As a result of the unlawful conduct, the elderly mobile home owners represented by the Coquina Crossing Homeowners Association, Inc., suffered an antitrust injury resulting in damages in excess of $30,000.00. This conspiracy, combination, or concert of action resulted in higher mobile home lot rental prices paid by elderly natural persons for the use of mobile home park facilities than would have existed in a competitive market.

3.     Defendants' unlawful conduct is continuing and unless equitable relief is granted artificially inflated mobile home lot rental prices for the use of mobile home park facilities will continue unabated.

**A.     Representative Action by the Coquina Crossing HOA**

4.     Plaintiff Coquina Crossing Homeowners Association, Inc., ("Coquina Crossing HOA"), is a Florida not-for-profit corporation with its principal place of business located at P.O. Box 42, St. Johns County, Elkton, Florida. The Coquina Crossing HOA is an incorporated mobile home owner association and the legal representative under § 723.075 (1), *Fla. Stat.*, of all of the mobile home owners in the Park "in all matters relating to the Florida Mobile Home Act." *See*] §§ 723.075(1) and 723.076(1) and "matters of common interest ." *Rule* 1.222, *Fla. R. Civil P.* The Plaintiff represents itself, and over 900 current and former mobile homeowners in the Park. The relationship between the

4

Coquina Crossing HOA, the homeowners represented by the Coquina Crossing HOA and the Park owner or operators is regulated under Chapter 723, *Fla. Stat.*, and encompasses a broadly defined "lot rental agreement" which includes, *inter alia*, a prospectus. Exh. A is attached and adopted.

**B.     The Nature of the Product or Service: "55 or Older" Mobile Home Park**

5.     The Park is an age 55 or older mobile home park with 742 mobile home rental residential lots. The Park is located at 4536 Coquina Crossing Dr., St. Johns County, City of Elkton, Florida. The Plaintiff mobile homeowners are largely elderly persons over 65 years of age. The mobile homes are valued between $25,000 and more than $100,000. Most homes are paid for with cash, usually comprising all or a substantial amount of the homeowners' life savings. They lease the lot underneath their mobile home from the Park owner or operators.

**C.     Sam Zell, Chairman of Equity Lifestyle, Likes the "Oligopoly" Nature of the Mobile Home Park Industry**

6.     Approximately 1.8 million Floridians today live in a mobile home. In a 2014 Tampa Bay Times newspaper article, it was noted that the population of Florida mobile homeowners represents five times the entire population of the city of Tampa, Florida. Most of those homeowners earn less than $30,000 per year. Largely, those mobile homeowners are a captive audience: "... As Frank Rolfe, a park owner who runs [the[ Mobile Home University, a boot camp for investors, told *Bloomberg*, 'We're like a Waffle House where everyone is chained to the booths." *Mobile home park investors bet on older, poorer America,* Tampa Bay Times, May 19, 2014.[1] "Years ago, the mobile home industry was mostly ignored save for a few investment titans. Warren Buffet paid $1.7 billion in 2003 to buy Clayton Homes, one of America's largest mobile home conglomerates. Sam

---

1      https://www.tampabay.com/news/business/realestate/mobile-home-park-investors-bet-on-older-poorer-america/2180277/

EXHIBIT "A"

Zell, the billionaire chairman of Equity Lifestyle, said in a 2012 conference call he liked the 'oligopoly nature of our business.'" [referring to the mobile home park industry] *Id.* The MHC/Equity LifeStyle Defendants directly or indirectly own, control, or operate 77 age-qualified Florida mobile home parks with approximately 32,000 mobile home sites with gross revenues in excess of $230 million annually.

### D. Geographic Area or the Market: St. Johns County, Florida

7.     St. Johns County has a population of approximately 275,000 persons. Sixteen per cent of the population is 65 years of age or older. There are twelve mobile home parks in St. Johns County, Florida. Five of those parks are "55 or older" mobile home parks which would market to a group of elderly retirees, such as those represented by the Coquina Crossing HOA. The monthly lot rental amount varies by only a minor amount between the Park and the "comparables" used by the Defendants in rejecting the representative Coquina Crossing HOA's attempts to negotiate mitigation of the existing regular annual lot rental increases of four to five per cent.

## II.   DEFENDANTS

### A.   The MHC/Equity LifeStyle Defendants

8.     Defendant **MHC Operating Limited Partnership ("MHC Operating"),** is a foreign (Illinois) limited partnership, formed in 1993 with a principal address of Two North Riverside Plaza, Suite 800, Chicago, Illinois, which is also the Chicago corporate headquarters for Defendants Equity LifeStyle Properties, Inc. and MHC Coquina Crossing, L.L.C. MHC Operating is also engaged in business at the Park. MHC Operating is a general partner of Equity LifeStyle Properties, Inc., since April 2004. MHC Operating is described in official court records in the St. Johns County Clerk of Court as the "mobile home park owner" of the Park as defined by § 723.003(13), *Fla. Stat.,* which includes an "owner" or "operator." MHC Operating is also an operator of the Park.

EXHIBIT "A"

9.      Defendant **Equity LifeStyle Properties, Inc., ("Equity LifeStyle")** is a foreign (Maryland) corporation with its principal place of business in Florida at: 4300 W. Cypress St., Suite 400, Tampa, in Hillsborough County; and in Illinois at: Two North Riverside Plaza, Suite 800, Chicago, Illinois. Equity LifeStyle is the "mobile home park owner" of the Park as defined by § 723.003(13), *Fla. Stat.*, which includes an "owner" or "operator." Equity LifeStyle is also an operator of the Park. Equity LifeStyle is publicly traded on the New York Stock Exchange. Equity LifeStyles is a subsidiary of MHC Operating Limited Partnership.

10.     Defendant **MHC Coquina Crossing, L.L.C. ("MHC Coquina Crossing")** is a Delaware limited liability company with its principal place of business located at Two North Riverside Plaza, Suite 800, Chicago, IL 60606, which is also the Chicago corporate headquarters for Defendants Equity LifeStyle Properties, Inc., and MHC Operating Limited Partnership. MHC Coquina Crossing is also engaged in business at the Park. MHC Coquina Crossing is described in official court records in the St. Johns County Clerk of Court as the "mobile home park owner" of the Park as defined by § 723.003(13), *Fla. Stat.*, which includes an "owner" or "operator." MHC Coquina Crossing is also an "operator" of the Park as defined by § 723.003(16), *Fla. Stat.* Its Managing Member is MHC Operating Limited Partnership, the same holding company for Defendant Equity LifeStyle Properties, Inc.

11.     Defendant **Eric Zimmerman** is an individual citizen of Florida domiciled at 12629 New Brittany Blvd., #16, Fort Myers, in Lee County, Florida. Eric Zimmerman was a Regional Vice President of Defendant Equity LifeStyle Properties, Inc., from 2011 through July 2018. He is currently Vice President and Chief Operating Officer at Murex Properties, LLC. Eric Zimmerman was also engaged in business from 2011 through July 2018 as an operator of the Park as defined by § 723.003(16), *Fla. Stat.* He has held leadership positions of the Defendant Florida Manufactured Housing Association, Inc. –

7

EXHIBIT "A"

the trade association for park owners.

12.     Defendant **Gena May** is an individual citizen of Florida domiciled at
Lake County at 13510 Palo Ct., Clermont, Florida. Gena May was a Regional Manager
of Defendant Equity LifeStyle from July 2009 through May 2016. Gena May was also
engaged in business from July 2009 through May 2016 as an operator of the Park as
defined by § 723.003(16), *Fla. Stat.* Gena May is currently employed as a Regional Vice
President of Operations & Sales with Sun Communities since May 2016.

13.     Defendant **Jared Lambert** is an individual citizen of Florida domiciled
at Polk County 4634 Devonwood Ct., Lakeland, Florida. Jared Lambert was a Senior
Regional Manager of Defendant Equity LifeStyle from October 2011 through July 2017.
Jared Lambert is currently employed as a Regional Vice President with Murex Properties,
LLC, since April 2020. Jared Lambert was also engaged in business from 2011 through
2017 as an operator of the Park as defined by § 723.003(16), *Fla. Stat.*

14.     Defendant **William Smoljanovich** is an individual citizen of Florida
domiciled on Pasco County at 31351 Bridgegate Dr., Wesley Chapel, Florida. William
Smoljanovich is a Regional Manager of Defendant Equity LifeStyle from 2018 through
present. William Smoljanovich was also engaged in business from 2018 through present as
an operator of the Park as defined by § 723.003(16), *Fla. Stat.* William Smoljanovich was
previously a Regional Vice President of Sales and Operations at Sun Communities.

15.     Defendant **Marta Lindstrom** is an individual citizen of Florida domiciled
at Volusia County at 11 Brookside Cir., Ormond Beach, Florida. Marta Lindstrom was
the Park manager and operator from 2018 to 2020. Marta Lindstrom was recently hired
by Murex Properties, L.L.C., to be the Park manager at Aberdeen Mobile Home Park in
Ormond Beach, Florida.

16.     MHC Operating, Equity LifeStyle, MHC Coquina Crossing, Eric
Zimmerman, Gena May, Jared Lambert, William Smoljanovich, and Marta Lindstrom are

EXHIBIT "A"

collectively referred to herein as the "MHC/Equity LifeStyle Defendants."

     **B.**    **The FMHA Trade Association Defendant**

    17.    Defendant **Florida Manufactured Housing Association, Inc., ("FMHA Trade Association Defendant")** is a Florida corporation with its principal place of business at 1284 Timberlane Rd., Tallahassee, Florida. The FMHA Trade Association Defendant is a trade association for all Florida mobile home park owners.

     **C.**    **The Lutz Bobo Law Firm Defendants**

    18.    Defendant **J. Allen Bobo ("Allen Bobo")** is an individual citizen of Florida domiciled in Sarasota County, Florida at an unknown physical address. Allen Bobo is a licensed Florida lawyer since 1982, a partner, principal, or shareholder of Defendant Lutz, Bobo & Telfair, P.A., 2 N. Tamiami Trail, Ste. 500, Sarasota County, Sarasota, Florida.

    19.    Defendant **Lutz, Bobo & Telfair, P.A. ("Lutz Bobo Law Firm")**, d/b/a Lutz, Bobo, Telfair, Eastman, Gabel & Lee, f/k/a Lutz, Webb & Bobo, P.A., is a Florida corporation which operates in Leon County, Florida at 2155 Delta Blvd., Suite 201B, Tallahassee, Florida and in Sarasota County, Florida at One Sarasota Tower, Two North Tamiami Trail, Fifth Floor, Sarasota, Florida.

    20.    Allen Bobo and the Lutz Bobo Law Firm are collectively referred to herein as the "Lutz Bobo Law Firm" Defendants.

**III.**    **JURISDICTION AND VENUE**

    21.    Count One of this Complaint is an action for treble damages arising under § 542.18, *Fla. Stat.*, in accordance with § 542.22, *Fla. Stat.*, and for injunctive relief in accordance with § 542.23, *Fla. Stat.* This Court has jurisdiction of this claim arising under the Florida Antitrust Act, Chapter 542, *Fla. Stat.* Plaintiff also seeks relief in Count Two under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.* Jurisdiction of the federal ADA claim is concurrent under 18 U.S.C. § 3231, as construed

9

EXHIBIT "A"

by *Tafflin et al., v. Levitt, et al.*, 493 U.S. 455 (1990). This Court also has personal jurisdiction over each Defendant under § 48.193, *Fla. Stat.*, because, among other reasons, each Defendant operates, conducts, engages in, or carries on a business or business venture in the State of Florida or has an office in the State of Florida or has committed tortious acts within the State of Florida.

22.     Venue is proper under §§ 47.011, 47.021, and § 542.30, *Fla. Stat.*

23.     Plaintiff seeks damages in excess of $30,000.00, injunctive relief, attorneys' fees, and costs on behalf of itself and the represented mobile homeowners.

## IV.     ACTS IN FURTHERANCE OF THE CONSPIRACY

### A.     Extort Adoption of an Illegal Rental Agreement

24.     The MHC/Equity LifeStyle Defendants have, over the past five years repeatedly, and outside of either statutory meetings or confidential mediation efforts, extorted the representative Coquina Crossing HOA and Plaintiff mobile homeowners to adopt an illegal standardized lot rental agreement ("LTA") authored and drafted by the Lutz Bobo Law Firm Defendants. The FMHA Trade Association Defendant encouraged distribution and discussion of the terms of the LTA among its assembly of mobile home park owners. A copy of the form or standardized LTA is attached as Exhibit B and adopted.

25.     Section 3 of the standardized LTA required that if the Coquina Crossing HOA contended that MHC Coquina Crossing was in violation of the LTA, the prospectus, any rental agreement, or the Florida Mobile Home Act, the Coquina Crossing HOA must notify MHC Coquina Crossing in writing of the facts "giving rise to and constituting such alleged Non-Compliance" by certified mail within thirty days of the date the Coquina Crossing HOA received reasonable notice of such facts. The LTA then provided MHC Coquina Crossing fifteen days from receipt of the notice to "cure" the

EXHIBIT "A"

alleged non-compliance. Upon completion of any such cure, MHC Coquina Crossing was to be "deemed" not to have been in default or in violation.

26.     Section 3 of the LTA required that the thirty day notice and fifteen day opportunity to cure provisions be deemed to be a condition precedent to any legal action.

27.     Section 4 of the LTA prohibited an award of attorneys' fees or costs in any proceeding "by or on behalf of any former or current Homeowner seeking to invalidate or otherwise dispute the validity of the [LTA]." Further, section 4 of the LTA required the Coquina Crossing HOA and MHC Coquina Crossing to "mutually enforce this Agreement and cooperate fully in the event the validity or integrity of this Agreement is attacked or disputed by any such Homeowner."

28.     Section 5 of the LTA required that any controversy or claim related to the LTA shall first require non-binding mediation under Chapter 44, , *Fla. Stat.* Section 5 also required that in any court proceeding "arising out of or relating to" the LTA, the parties must waive their right to a jury trial.

29.     Section 6 "Association Release" of the LTA expressly releases the Defendants (along with a broad litany of unknown and unidentified persons and entities) and:

> ... their parents, affiliates, subsidiaries, officers, directors, agents, stockholders, members, attorneys, successors and assigns from any and all claims, actions or causes of action of any kind whatsoever ?? ("Claims"), whether legal, equitable, administrative, or otherwise, which the Association now has or ever had including, but not limited to, Claims involving or relating to rents, services, maintenance, or Owner's compliance with or delivery of the Community's prospectuses, rental agreements, as well as any other alleged violation of Chapter 723, Florida Statutes. The Claims shall specifically include all claims, actions, causes of action, or reduction in service arising or in any related to the lack of an indoor pool from approximately August 2011.

11

EXHIBIT "A"

30.     Section 6 (or an unmarked Section 7) of the LTA elevated the LTA as controlling in the event of a conflict between the LTA and the prospectus or rental agreement.

31.     Section 8 of the LTA declared that the LTA superseded all prior and contemporaneous discussions, negotiations, conditions or understandings relating to the LTA.

32.     Section 9 of the LTA required that the Coquina Crossing HOA "confirm the validity" of the LTA and execute documents and take action as requested by the Defendants to "carry out or more effectively satisfy the intent and purposes" of the LTA.

33.     The above provisions of the LTA are in clear violation of Chapter 723, The Florida Mobile Act, the Florida Constitution, and the U.S. Constitution and are injurious to the Plaintiff.

34.     The MHC/Equity LifeStyle Defendants' close relationships with the FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants enable them to collaborate with other mobile home park owners and ultimately with each other to develop and expand state-wide adoption of the LTA by other mobile home park owners. In 2016 Attorney Allen Bobo, partner in the Lutz Bobo Law Firm, described that he worked closely with Eric Zimmerman, then Senior Vice President of Equity LifeStyle, on revisions and implementation of LTAs identical to the LTA in the instant cause. In one instance, recited Allen Bobo, a homeowner (in another Equity LifeStyle Park) pointed to an ambiguity in the LTA favorable to their homeowner association. In response, Eric Zimmerman then quipped to Allen Bobo: "How did you miss that one, Allen?"

35.     In the March 28, 2013 meeting notes of the Equity LifeStyle supported Networking for Progress Group, the notes taken of the meeting between representatives of various Florida Equity LifeStyle Parks and Eric Zimmerman discussed the LTA:

EXHIBIT "A"

> ****
>
> ELS standardized the Long Term Agreement 3-4 years ago but has made
> some minor tweaks to it as needed. The only thing that will change
> from community to community will be the amount of the increase and
> the term. There will be no wish lists included in future LTAs, strictly
> rent. Wish lists (to be included in the Capx budget), are to be discussed
> with the manager and regional manager at the quarterly meetings (which
> must be requested).
>
> ****

(Exh. C is attached and adopted)

36.     In the September 12, 2013 meeting notes of the Select Committee of

the Equity LifeStyle supported Networking for Progress Group, the notes taken of the

meeting between representatives of various Florida Equity LifeStyle Parks and Eric

Zimmerman discussed the LTA:

> ****
>
> Long Term Agreements: were discussed, first with the ELS definition
> being a rental agreement that may change the terms of the prospectus.
> This was not an in depth discussion of rental agreements but was brought
> up because several communities are reporting that ELS has refused
> to meet and discuss long term agreements. We were reminded by Eric
> [Zimmerman] that they are actually required to meet just once and that
> should be within the thirty days (as requested) after receiving the 90
> day notice per FS, Chapter 723.037. Eric [Zimmerman] pointed out that
> the negotiating committee has the full authority to sign the long term
> agreement.
>
> ****

(See Exh. C)

37.     In the November 21, 2013 meeting notes of the Select Committee of

the Equity LifeStyle supported Networking for Progress Group, the notes taken of the

meeting between representatives of various Florida Equity LifeStyle Parks and Eric

Zimmerman discussed the LTA:

> ****

EXHIBIT "A"

Future LTAs will be reviewed by in house counsel. It was pointed out that the language in the LTA, particularly that referring to the waiver, is one of the reasons that communities are not signing the agreement. Eric [Zimmerman] pointed out that that paragraph refers only to situations that have occurred to that point (NOT FUTURE SITUATIONS). If there are issues serious enough that you are considering legal action against ELS they should be discussed (prior to signing the agreement) in an effort to work them out. The purpose of the waiver is after working out a favorable agreement in good faith, they (ELS) don't want to be faced with a lawsuit.

Remember, if you previously signed the long term agreement (LTA) (containing the clauses referenced above), when the LTA expires, so do the terms of those clauses, UNLESS the LTA contained language stating otherwise. Communities with CPI (only) based increases typically don't have long term agreements. Eric [Zimmerman] explained that the release for ELS in the LTA speaks to the many reasons somebody may choose to sue them. The reason the HOA isn't offered the same release is because there don't appear to be any reasons why ELS would want to sue them.

Long Term Agreements may vary, but are typically three years. Rounding of rent increases are determined by the prospectus for the community, some allow rounding up to one (1) dollar, some allow up to five (5) dollars.

There are no penalties for not signing the long term agreement.

Market, CPI, home sales and a variety of economic factors are taken into consideration to determine rates of increase, not the expected return to stockholders, as suggested.

****

(See Exh. C)

38.     In the February 19, 2015 meeting notes of the Select Committee of the Equity LifeStyle supported Networking for Progress Group, the notes taken of the meeting between representatives of various Florida Equity LifeStyle Parks and Eric Zimmerman discussed the LTA:

****

14

EXHIBIT "A"

... Relocating resident policy: ELS's policy regarding relocating residents is the same as addressed in the LTA under Homeowners Affected by this Agreement; Transferees. If ..... any included Homeowner transfers or sells any legal or equitable interest in such Homeowner's mobile home to any transferee or resale purchaser (collectively, a "Transferee"), the Transferee shall be permitted to assume such included Homeowners rental agreement but only for the remainder of the annual lease term then in effect between the included Homeowner and Owner. Upon the expiration of such annual lease term the Transferee's rent shall be adjusted to the Community's then prevailing market rate ..... " Which is basically the same as FS Chapter 723.059 (3) The purchaser of a mobile home who becomes a resident of the mobile home park in accordance with this section has the right to assume the remainder of the term of any rental agreement then in effect between the mobile home park owner and the seller ............ .

It should be noted that residents relocating within the community that are purchasers of ELS inventory homes won't have a lease to assume and will start their new lease at market rent but are eligible for any rent concession programs being offered to new residents at that time.

**\*\*\*\***

(Exh. D is attached and adopted)

39.     In 2016, Florida Attorney Shawn Arbeiter disclosed that Attorney Allen Bobo (then a partner and shareholder of the Lutz Bobo Law Firm) had made numerous and regular annual presentations to the FMHA Trade Association Defendant's annual meeting of Florida mobile home park owners informing the FMHA Trade Association Defendant's assembly of litigation tactics of mobile home plaintiffs' attorneys. According to Arbeiter, those lengthy presentations by Bobo included opinionated and disparaging remarks by Bobo and assembly members of the undersigned Plaintiff's Counsel Perry's trial strategy including, but not limited to: application of the Florida Deceptive and Unfair Trade Practices Act to lot rental, common area maintenance, and LTA issues in state court litigation. Attorney Bobo also disclosed that in an earlier and separate presentation to the FMHA Trade Association Defendant assembly, he described existing statewide mobile

EXHIBIT "A"

home lot rental amounts as "not high enough," explaining that if lot rent increases were appropriately higher, that retiree mobile homeowners would be filing lawsuits all over the state.

40.     Since 2016, the Equity LifeStyle Defendants have imposed a flat four per cent annual lot rental increase. The Equity LifeStyle Defendants refused to discuss with the representative Homeowners' Committee of the Coquina Crossing HOA the basis or justification for the flat four per cent increase. The Equity LifeStyle Defendants flatly rejected the Coquina Crossing HOA's Homeowners' Committee's submission of other park comparables and other matters in mitigation in violation of Florida law.

41.     On repeated occasions since 2016, the Equity LifeStyle Defendants extorted the elderly Plaintiff and their representative Coquina Crossing HOA in violation of Florida law by offering to consider a lesser lot rental increase if the Plaintiff and their representative Coquina Crossing HOA would agree to execute an illegal standardized LTA on behalf of all of the plaintiff homeowners in the Park.

**B.      Fraudulent and Unreasonable Lot Rental Categories and Amount**

42.     The Equity LifeStyle Defendants' lot rental categorization of "on water" is false and fraudulent. The Park "on water" categorization are simply retention ponds. During substantial periods of the year those retention ponds are eyesores and a drag on access, use, and enjoyment of the property or Park.

43.     Lots categorized as facing a "wooded" are also false and fraudulent. The land falsely attributed to "wooded" is simply conservation area with accumulated overgrowth, rubbish and debris. According to the local Fire Marshall, the close proximity of a home to the "wooded" conservation area creates a significant fire risk to those homes.

44.     Lots facing or in proximity to a "wooded" currently pay a premium of approximately $40 per month or $480 per year. "Water" lots pay a premium of

EXHIBIT "A"

approximately $120 per month or $1,440 per year.

45.     There are 742 approved lots in the Park which include 36 rentals. Approximately 260 homeowners pay an average of $912 per year or a total of $237,120 for falsely being on "water" or in the proximity of a "wooded" area. Considering that the average residency for a mobile homeowner is ten years, the damages from the false and fraudulent lot rental premium categorization exceeds 2.3 million dollars.

**C.     Defendants Impose Illegal Fees and Charges**

46.     The following fees and charges "authorized" by the Prospectus[2] were implemented or are enforced in an illegal, discriminatory, retaliatory, or unreasonable manner by the Equity LifeStyle Defendants in violation of Florida and federal law or are otherwise unconscionable and oppressive:

- New Resident Processing Charge ($300);
- Additional Occupant/Guest Fee ($15 per person per month);
- Delinquent Lot Rental Fee (10% late fee due if not paid on or before the fifth day of the month);
- Special Service Fee ($15 per hour - minimum one hour);
- Water or Sewer Line Repair Fee.

**D.     Defendants Unreasonably Eliminate or Reduce Services**

47.     The Equity LifeStyle Defendants unreasonably eliminated or reduced services without an advance 90 day written notice or a corresponding reduction in lot rent in violation of Florida law, including, but not limited to:

---

2       Exhibit A. The fees indicated were handwritten entries on the Prospectus.

EXHIBIT "A"

A.    The Equity LifeStyle Defendants are unresponsive and have reduced maintenance;

    1.    Full-time maintenance staff reduced. During the class period maintenance employees' hours were reduced by 70 hours per week of maintenance labor;

    2.    The Equity LifeStyle Defendants do not respond to the phone calls, emails, and other correspondence;

    3.    The Equity LifeStyle Defendants do not conduct 360-degree home inspections; does not enforce rules and regulations and are unavailable after normal business hours to enforce the rules and regulations;

B.    Pool, Hot-tub/spa

    1.    The Park swimming pools and hot tub bottoms are frequently discolored and unsightly, causing homeowners to question their cleanliness. The grouting around the edges of the outdoor pool and the hot tub require replacement or repair. The Hoyer lift in the indoor pool is inoperative;

    2.    The Equity LifeStyle Defendants purchased unsafe pool furniture resulting in falls by homeowners;

C.    Security

    1.    The Equity LifeStyle Defendants are unresponsive to homeowner or law enforcement reports of criminal behavior in the Park. The Equity LifeStyle Defendants have neglected to provide law enforcement standing permission to issue trespass orders to strangers who enter the Park;

    2.    The Park gate and the gate security camera system have

EXHIBIT "A"

been inoperative for weeks and months at a time;

D.   Clubhouse

    1.   The Equity LifeStyle Defendants have no security or
supervision of members of the general public who use the
clubhouse facilities.

E.   Common Areas - Facilities, lighting, landscaping, etc.

    1.   There are inadequate Park-wide water shut-off valves.
The shut-off valves for each home were buried and often
defective;

    2.   Partial power outages in the Park are common occurrences.
Several sections in the Park are on conjoined breakers
which, in the event of a power loss, delay restoration
of electricity for days while the rest of the Park enjoys
restoration of electricity in a matter of hours.

F.   Common Areas - Streets

    1.   The streets throughout the Park and clubhouse parking lots
are in disrepair, crumbling and dangerous to pedestrians and
bicycle traffic. The Equity LifeStyle Defendants' periodic
repaving of the clubhouse parking lot did not include a
working drainage system to eliminate the conditions;

    2.   Streets throughout the Park are unsightly. Grass grows in
some of the cracks in the pavement;

    3.   The Park water sprinklers are infrequently activated or
when activated are not left on long enough to provide
adequate water for the lawns. Typically, the water sprinklers
are misdirected and not adjusted to provide even coverage.

EXHIBIT "A"

The consequence of improper sprinkling is that the lawns in the Park are unsightly and damaged;

G.   "55 and Older" Park

1.   The Equity LifeStyle Defendants have failed to supervise or restrict children in the shared facilities in the Park as required by the properly promulgated Park rules and regulations. Unlicensed persons frequently drive golf carts without supervision.

V.   COUNT I:   FLORIDA ANTITRUST ACT - RESTRAINT ON TRADE OR COMMERCE - PRICE-FIXING

(Against All Defendants)

*Fla. Stat.* § 542.18

48.   Plaintiff realleges and restates paragraphs 1 through 47 as if fully set forth herein and further state:

49.   This is an action against the MHC/Equity LifeStyle Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants for their violation of the Florida Antitrust Act, Section 542.18, *Fla. Stat.*

50.   Since at least October 2016, the MHC/Equity LifeStyle Defendants (or one or more of its subsidiaries) leased mobile home lots to the homeowners represented by the Plaintiff, in a continuous and uninterrupted flow of interstate trade or commerce, including through and into this judicial district within the meaning of the Florida Antitrust Act.

51.   The MHC/Equity LifeStyle Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants knowingly—that is, voluntarily and intentionally—extorted under Florida law and attempted to entered into a continuing agreement, understanding, and conspiracy to raise, fix, maintain, and/or to impose a

20

EXHIBIT "A"

mobile home lot rental by subjecting the Plaintiff mobile homeowners, their representative mobile homeowner associations ("HOAs"), and the Park lot rental agreements to, among other things, impose a LTA, thereby reducing or eliminating price competition.

52.     To be clear, Plaintiff is not alleging that the MHC/Equity LifeStyle Defendants, working with FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants, conspired to fix the prices of mobile home lot rental amount at the same level. Instead, the MHC/Equity LifeStyle Defendants, working with FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants, conspired to eliminate discounting of lot rental amount by ensuring that all park owners charged the same minimum price and used the same terms.[3] The MHC/Equity LifeStyle Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm all share an interest in not reducing the lot rental amount.

53.     The scheme was anything but "unilateral." The conduct at issue here can be characterized similarly to how the United States Supreme Court characterized the conduct at issue in *United States v. General Motors Corp.*: "once the agreements were secured, General Motors both solicited and employed the assistance of its alleged co-conspirators in helping to police them. What resulted was a fabric interwoven by many strands of joint action to eliminate the discounters from participation in the market, to inhibit the free choice of dealers to select their own methods of trade and to provide multilateral surveillance and enforcement. This process for achieving and enforcing the desired objective can by no stretch of the imagination be described as 'unilateral' or merely 'parallel.'" 384 U.S. 127, 148 (1966)

54.     The FMHA Trade Association Defendant, as the Florida mobile home park owners' trade association represented by the Lutz Bobo Law Firm Defendants,

---

3     As the United States Supreme Court stated in *Catalano, Inc. v. Target Sales*, 446 U.S. 643, 648 (1980), an "agreement to eliminate discounts" "falls squarely within the traditional *per se* rule against price fixing." (Emphasis added)

EXHIBIT "A"

worked with the MHC/Equity LifeStyle Defendants and the Lutz Bobo Law Firm Defendants to develop and implement LTAs and other matters alleged herein, *supra*, across Florida mobile home parks. That is, FMHA Trade Association Defendant, was in a position to communicate to Florida mobile home park owners before it implemented the scheme including, but not limited to, the LTA that its competitors also intended to do so and the suggested format of the LTA.

55.     The MHC/Equity LifeStyle Defendants and the Lutz Bobo Law Firm Defendants' close relationships with the FMHA Trade Association Defendant, enabled them to collaborate with other mobile home park owners and ultimately with each other to develop these conspiratorial plans, including the LTA. Since 2015 Allen Bobo, and the Lutz Bobo Law Firm worked closely with Eric Zimmerman, then Senior Vice President of Equity LifeStyle, on revisions and implementation of LTAs, for example.

56.     Each of the MHC/Equity LifeStyle Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants had a motive to maintain high retail prices for mobile home lot rental amounts. In addition, in order to encourage independent mobile home park owners to adopt and implement LTAs, the MHC/Equity LifeStyle Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants needed to keep the resale mobile home lot rental amounts high.

57.     The MHC/Equity LifeStyle Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants have also demonstrated a past propensity to conspire against other mobile home park owners discounting mobile home lot rental amounts.

58.     The MHC/Equity LifeStyle Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants' agreement to implement LTAs has harmed and continues to harm competition by increasing prices for the mobile home lot rental amounts made subject to them. Consumers ultimately pay the economic cost of this

EXHIBIT "A"

wrongful conduct in the form of higher prices for mobile home lot rental amounts affected by LTAs. The effect of the LTAs has been to limit consumer choice by depriving them of the ability to shop around for discounts on mobile home lot rental amounts.

59.     The MHC/Equity LifeStyle Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants (and their co-conspirators) furthered and effectuated their conspiracy in the following ways, among others:

A.     Participating in secret communications, discussions, and meetings in the U.S. to exchange confidential and competitively sensitive information regarding each other's lot rental amounts charged in their Florida mobile home business;

B.     From time to time, discussing and agreeing during those conversations and meetings to set a price floor to be quoted to a mobile homeowner;

C.     Perpetuating the Florida mobile home industry-wide intentional frustration of the Plaintiff's and other representative homeowners' associations' statutory right of first refusal to purchase their Park;

D.     Perpetuating the distribution of an illegal LTA which supports their fixed rent increases and violates Chapter 723, *Fla. Stat.*, and the homeowners' right to a civil jury trial in violation of the Florida and United States Constitution;

E.     Imposed fraudulent and unreasonable lot rental categories and amount;

F.     Imposed illegal fees and charges; and

G.     Unreasonably eliminated or reduced services.

60.     As a direct and proximate result of the MHC/Equity LifeStyle Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants' conduct,

23

the homeowners represented by the Plaintiff have been harmed and will continue to be harmed by paying supra-competitive lot rental amounts charged in Florida mobile home parks that they would not have paid in the absence of the conspiracy.

61.     The MHC/Equity LifeStyle Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants' combination, conspiracy, acts, and practices, or the effects thereof, are continuing and will continue and are likely to recur unless permanently restrained and enjoined.

**RELIEF REQUESTED**

Wherefore, Plaintiff respectfully requests the following relief:

1.     A jury verdict for compensatory damages;

2.     A judgment against all defendants, jointly and severally, by the Court for treble the amount of the jury verdict and for attorney's fees, costs and interest as allowable by law for violations of the Florida Antitrust Act;

3.     An order that each defendant be permanently enjoined from future violations of Chapter 542, *Fla. Stat.*

4.     An order that the plaintiff be awarded its costs of this suit and reasonable attorney's fees pursuant to § 542.22(1), *Fla. Stat.*;

5.     A judgment and decree that the defendants have engaged in an unlawful combination or a conspiracy restricting trade and commerce in violation of § 542.18, *Fla. Stat.*

6.     Award the Plaintiff such other and further equitable and legal relief as the Court deems just and necessary.

EXHIBIT "A"

## VI.   COUNT 2:   VIOLATION OF THE AMERICANS WITH DISABILITIES ACT ("ADA")

**(Against Defendants MHC Operating, Equity LifeStyle, MHC Coquina Crossing, Eric Zimmerman, Gena May, Jared Lambert, William Smoljanovich, and Marta Lindstrom)**

**42 U.S.C. §§ 12101 *et seq***

62.     Plaintiff realleges and restates paragraphs 1 through 16 and 21 through 22 as if fully set forth herein and further state:

63.     The homeowners represented by the Plaintiff are elderly persons. They have mobility, balance, gait, vision, and hearing difficulties. When traveling about in public, many mobile homeowners require the use of either walking canes or sticks, walkers, wheelchairs, audiovisual devices, and hearing aids. Consequently, many mobile homeowners are physically disabled, as defined by all applicable Florida and United States laws, and a member of the public whose rights are protected by these laws.

64.     The homeowners represented by the Plaintiff suffer from low vision and age-related cognitive decline as a "qualified disability" under the ADA as defined in 42 U.S.C. §12012 (1)(A) and in 42 U.S.C. 3602, §802(h). They are substantially limited in performing one or more major life activities, including but not limited to accurately visualizing their world, adequately traversing obstacles and walking without assistance.

65.     Many of the elderly mobile homeowners are disabled and have mobility and accessibility challenges. The MHC/Equity LifeStyle Defendants refuse to make even common areas of public accommodation ADA compliant. In response to the Plaintiff's expressed concerns, the MHC/Equity LifeStyle Defendants asserted that the Americans with Disabilities Act is inapplicable to the Park Clubhouse and refuse to discuss it further.

66.     The MHC/Equity LifeStyle Defendants regularly meet with and encourage the general public to enter the clubhouse facilities to discuss Park business

EXHIBIT "A"

and permit outside guests and vendors to traverse the Park facilities. The clubhouse was also previously used as a public voting precinct. The MHC/Equity LifeStyle Defendants have no security or supervision of members of the general public who use the clubhouse facilities.

67.     The Park clubhouse, main room with seating for 300 persons and dance floor, library, billiards area, pool, card and game room are public accommodations, open to the public—including prospective home purchasers—and whose operation affects commerce.

68.     The Plaintiff mobile home owners live in the Park and visit the Park facilities on a regular basis. Plaintiff mobile home owners regularly encounter barriers (both physical and intangible) that interfered with - if not outright denied - their ability to use and enjoy the goods, services, privileges and accommodations offered at the Park. Plaintiff mobile home owners personally encountered the following barriers at the Facility:

A.     There is no unassisted access to the public restrooms located inside the main Clubhouse building. Both the public restrooms in the clubhouse and the pool area have two doors to open, neither of which has any handicap assistance. The doors are heavy with automatic closures. They cannot be opened by a person in a wheelchair or using a walker;

B.     The outdoor pool does not have a lift. The indoor pool lift has been inoperable for several years. It is battery operated. The battery is mounted in a charger on the adjacent wall. The battery indicates that it is charged but it will not operate the indoor pool lift;

C.     The Sales/Rental Office is located in a mobile home in the Park and has no handicap accessibility.

EXHIBIT "A"

69.     Plaintiff mobile home owners were, and continue to be deterred from visiting the Clubhouse because they know that the Clubhouse's goods, services, facilities, privileges, advantages, and accommodations deny full and equal access to Plaintiff mobile home owners due to their physical disabilities. Plaintiff mobile home owners have learned that the following additional barriers to their full and equal access exist at the Facility, each of which relates to his disabilities:

<u>Site Entrance Signage</u> -

  A. Site informational signage was not provided directing to the accessible entrance and route of travel.

<u>Accessible Parking</u> -

  B. There are four handicap parking spaces: two near the main clubhouse building entrance; one near the rear entrance of the main clubhouse building; and one near the south end of the clubhouse parking lot near the entrance to the dog walk. These handicap parking spaces are of proper size and have ramps available to the sidewalk;

  C. None of these handicap parking spaces have paint delineating the parking spaces. The parking space paint is faded completely. Nor is the remaining paint a correct color. Accessible parking access aisles are also not outlined in blue.

  D. The "Van Accessible" signage is degraded and faded. Accessible parking signage mounted on the pole for the south most space is not 80" minimum above the surface. That sign is only 49" above the surface.

EXHIBIT "A"

Exterior Accessible Routes -

    E.    A minimum of one accessible route was not provided from the public way to the accessible entrance.

    F.    Sidewalk has raised lips that exceed 1/4" in height.

    G.    Ramp at the end of the access aisle does not have edge protection on both sides of the ramp and exceeds 8.33%.

Accessible Doors -

    H.    Entrance door thresholds exceed 1/2" in height.

    I.    Handicap access to the main building is up a mild slope to a double door, one of which has power assist opening. These doors have no kickplate on the outside and a six inch kickplate on the inside. There is therefore, not the required smooth kick plate ten inch high on either door;

    J.    From the clubhouse there is a handicap assist door to the patio between the main building and the indoor pool. However, a person cannot leave or enter the indoor pool building as there is no handicap assist on the indoor pool doors. Also, the gate to the outdoor pool and to exit from the area are not operable from a wheelchair;

Restrooms -

    K.    The towel dispensers in the clubhouse restroom stalls are too high for a person in a wheelchair to reach. The Men's restroom towel dispenser is 60" from the floor, the Women's restroom towel dispenser is 58" from the floor. Both are partially blocked by the sink and commode. Both towel dispensers are mounted over an unused soap

EXHIBIT "A"

dispenser. If the unused dispensers were removed, the towel dispenser could be ten to twelve inches lower.

General -

    L.    There are no fire alarms, strobes, horns or sprinkler system in the main social events or large congregational ball room. There is no handicap access to the ballroom stage.

70.    Plaintiff mobile home owners live at the Park and must have ongoing access to the Clubhouse.

71.    The MHC/Equity LifeStyle Defendants knew or should have known that these elements and areas of the Clubhouse were inaccessible, violate state and federal law, and interfere with or deny access to the physically disabled. Moreover, the MHC/ Equity LifeStyle Defendants have the financial resources to remove these barriers from the Park without much difficulty or expense, and make the Park accessible to the physically disabled. To date, however, the MHC/Equity LifeStyle Defendants refuse to either remove those barriers or seek an unreasonable hardship exemption to excuse non-compliance.

72.    At all relevant times, the MHC/Equity LifeStyle Defendants have possessed and enjoyed sufficient control and authority to modify the Park to remove impediments to wheelchair access and to comply with the 2010 Standards for Accessible Design. The MHC/Equity LifeStyle Defendants have not removed the impediments and have not modified the Park to conform to accessibility standards. The MHC/Equity LifeStyle Defendants have intentionally maintained the Park in its current condition and have intentionally refrained from altering the Park so that it complies with the accessibility standards.

73.    Title III of the ADA holds as a "general rule" that no individual shall be

29

EXHIBIT "A"

discriminated against on the basis of disability in the full and equal enjoyment (or use) of goods, services, facilities, privileges, and accommodations offered by any person who owns, operates, or leases a place of public accommodation. 42 U.S.C. § 12182(a).

74.     The MHC/Equity LifeStyle Defendants discriminated against the homeowners represented by the Plaintiff by denying them "full and equal enjoyment" and use of the goods, services, facilities, privileges and accommodations of the Clubhouse during each visit.

75.     The ADA specifically prohibits failing to remove architectural barriers, which are structural in nature, in existing facilities where their removal is readily achievable. 42 U.S.C. § 12182(b)(2)(A)(iv).

76.     When an entity can demonstrate that removal of a barrier is not readily achievable, a failure to make goods, services, facilities, or accommodations available through alternative methods is also specifically prohibited if these methods are readily achievable. *Id.* § 12182(b)(2)(A)(v).

77.     Here, The homeowners represented by the Plaintiff allege that the MHC/ Equity LifeStyle Defendants can easily remove the architectural barriers at the Park without much difficulty or expense, and that the MHC/Equity LifeStyle Defendants, when it was readily achievable to do so.

78.     In the alternative, if it was not "readily achievable" for the MHC/Equity LifeStyle Defendants Lake to remove the Park's barriers, then the MHC/Equity LifeStyle Defendants violated the ADA by failing to make the required services available through alternative methods, which are readily achievable.

79.     Plaintiff has been obligated to retain the undersigned counsel for the filing and prosecution of this action. Plaintiff is entitled to have reasonable attorneys' fees, costs and expenses paid by the MHC/Equity LifeStyle Defendants.

EXHIBIT "A"

Case 3:21-cv-00084-MMH-LLL   Document 3   Filed 01/22/21   Page 31 of 31 PageID 173

**RELIEF REQUESTED**

Wherefore, Plaintiff respectfully requests the following relief:

1.  Enter judgment under the Americans With Disabilities Act, 42 U.S.C. §§ 12101, *et. seq.*, against the MHC/Equity LifeStyle Defendants for injunctive and declaratory relief;

2.  An order that the plaintiff be awarded its costs of this suit and reasonable attorney's fees.

3.  Award the Plaintiff such other and further equitable and legal relief as the Court deems just and necessary.

## VII.  JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues triable by jury.

September 29, 2020

/s/ Daniel W. Perry
DANIEL W. PERRY
FBN: 376671
4767 New Broad St #1007
Orlando, FL 32814-6405
Tel: 407.894.9003
Fax: 407.650.3459
dan@danielperry.com
Attorney for Plaintiff

EXHIBIT "A"